## Case No. 16,137.

### UNITED STATES v. REESE.

[5 Dill. 405; [1] 8 Cent. Law J. 453.]

Circuit Court, W. D. Arkansas. May Term, 1879.

INDIAN LANDS—"LANDS OF THE UNITED STATES"—CUTTING TIMBER THEREON—GRANT OF LANDS BY TREATY—PENAL STATUTES.

1. The Cherokee tribe of Indians hold their lands by a title different from the Indian title

[1] [Reported by Hon. John F. Dillon. Circuit Judge, and here reprinted by permission.]

—by occupancy. They derived it by grant from the United States. It is a base, qualified, or determinable fee, without the right of reversion, but only a possibility of reversion, in the United States.

[Cited in U. S. v. Rogers, 23 Fed. 664; Re Wolf, 27 Fed. 615; Cherokee Nation v. Southern Kansas R. Co., 33 Fed. 905.]

2. The lands of the Cherokee tribe of Indians cannot, therefore, be held to be "lands of the United States," in the sense of the language used in section 5388 of the Revised Statutes of the United States.

3. Penal statutes are to be construed strictly. If there is a fair doubt whether the act charged in the indictment is embraced in the criminal prohibition, that doubt is to be resolved in favor of the accused.

[Cited in U. S. v. Garretson, 42 Fed. 25.]

4. The treaty-making power of the United States can make a sale or grant of land to an Indian tribe without an act of congress.

5. Congress has no constitutional right to interfere with rights under treaties, except in cases purely political.

The defendant is charged, by an information preferred by the district attorney, and filed on the 5th of April, A. D. 1879, with violating section 5388 of the statutes of the United States, "by unlawfully cutting timber on lands situated and lying in the Cherokee Nation, in the Indian country, in the Western district of Arkansas, which said lands, in pursuance of law, may be reserved and purchased by the United States for military or other purposes." To the information the defendant, by his counsel, filed a demurrer, setting up (1) that the matters and things stated in the information do not constitute an offence, and (2) that this court has no jurisdiction of the offence charged in said information.

W. H. Clayton, U. S. Dist. Atty.
Duval & Cravens, for defendant.

PARKER, District Judge. The first ground of the demurrer is the only one I propose to notice; because, if this act charged against the defendant is one which is declared an offence by the section referred to in the statement of the case, I have no doubt the court has jurisdiction. Of course, if it is no offence, then it has no jurisdiction to try and punish, because there is nothing to which jurisdiction can attach. It is conceded in this case that the timber charged to have been cut by defendant was cut on lands formerly ceded by the United States to the Cherokee tribe of Indians. There are certain things which make up this offence. These are the elements which enter into it, and go to constitute it. They consist of the positive acts of the party charged, as well as the existence of other facts, all of which must exist before it can be held that the defendant is subject to the penalty prescribed by the law. In this case there must be a cutting of the timber by the defendant. It must be unlawfully done—that is, done wrongfully, without authority of the United

States or her agents. These are the positive acts of the defendant. In addition thereto, the cutting must be done on lands of the United States which, in pursuance of law, may be reserved or purchased for military or other purposes.

The pertinent question in this case is, Was this done upon "lands of the United States?" It is conceded that it was done upon lands which have been heretofore granted by the United States to the Cherokee Indians. Does the United States still have such a title to these lands as that they can be called lands of the United States in the sense of the law upon which this prosecution is based? If she has such a title thereto, this act of the defendant is a penal offence, and he is amenable to the punishment prescribed by the section above referred to. If she does not have such a title, this prosecution must fail, as being an act, although a gross outrage and a grievous wrong, not prohibited by law. To determine the question whether these are lands of the United States, requires a consideration of the title by which they are held by the Cherokee Nation. To any one who has given any attention to this subject, it presents a question not free from doubt or intrinsic difficulty. The Cherokee Nation of Indians derived their title to their lands from the United States by grant. This grant is by virtue of different treaties made between them and the United States. By the 2d article of the treaty of May 6, 1828 (Rev. Ind. Treat. 54), "the United States agrees to possess and guarantee to the Cherokees, forever, seven millions of acres of land, and this guarantee is hereby solemnly pledged." This land is a part of the country now occupied by them. On the 28th of May, 1830, congress passed a law, the 1st section of which provided that "it shall and may be lawful for the president of the United States to cause so much of any territory belonging to the United States, west of the river Mississippi, not included in any state or organized territory, and to which the Indian title has been extinguished, as he may judge necessary, to be divided into a suitable number of districts, for the reception of such tribes or nations of Indians as may choose to exchange the lands where they now reside, and remove, and to cause each of said districts to be so described by natural or artificial marks as to be easily distinguished from every other." Section 3 of said act provides "that in the making of any such exchange or exchanges, it shall and may be lawful for the president solemnly to assure the tribe or nation with which the exchange is made, that the United States will forever secure and guarantee to them and their heirs or successors the country so exchanged with them, and, if they prefer it, that the United States will cause a patent or grant to be made and executed to them for the same: provided, always,

that such lands shall revert to the United States if the Indians become extinct or abandon the same." [4 Stat. 411.]

By section 1 of the treaty of the 14th of February, 1833 [7 Stat. 414], concluded between the Cherokees and the United States (Rev. Ind. Treat. 63), "the United States agrees to possess the Cherokees, and to guarantee to them forever, and that guarantee is hereby pledged, of seven millions of acres of land, to be bounded" as set out in said article. By the 3d article of the treaty of the 29th of July, 1835 [7 Stat. 478], it is provided "that the lands ceded by the treaty of the 14th of February, 1833, including the outlet and those ceded by this treaty, shall all be included in one patent executed to the Cherokee Nation of Indians by the president of the United States, according to the provisions of the act of May 28, 1830" [Id. 311]. In pursuance of the terms of this. treaty, the president of the United States, on the 31st day of December, 1838, executed to the Cherokee Nation a patent for the seven millions of acres of land, for the outlet west, as well as the eight hundred thousand acres of land granted to them by the treaty of the 29th of July, 1835. The granting clause of this patent is as follows: "Therefore, in execution of the agreements and stipulations contained in the said several treaties, the United States have given and granted, and by these presents do give and grant, unto the said Cherokee Nation the two tracts of lands so surveyed and hereinbefore described, containing in the whole thirteen million three hundred and seventy-four thousand one hundred and thirty-six and fourteen one-hundreths acres; to have and to hold the same, together with all the rights, privileges, and appurtenances thereunto belonging, to the said Cherokee Nation forever; * * * subject, also, to all the rights reserved to the United States in and by the articles heretofore recited, to the extent and in the manner in which the said rights are so reserved, and subject, also, to the condition provided by the act of congress of the 28th of May, 1830, and which condition is, that the lands hereby granted shall revert to the United States if the said Cherokees become extinct or abandon the same."

Now, the question arises, what kind of a title do these several treaties, and this law of 1830, give the Cherokees to their lands? If it were not for the treaty of 1835, the treaty of 1833 is broad enough in its terms to convey a fee-simple title. This treaty is subsequent in date to the act of 1830, which contained the clause that the lands should revert to the United States if the Indians "become extinct or abandon the same." There is no limitation to the title conveyed by the United States under the treaty of 1833. If such treaty is inconsistent with the law of 1830, it repealed so much of it as was inconsistent. Besides, the act did not

make any grant; it only provided that it might be done.

The treaty-making power was not limited by its terms, as the authority to make a treaty with the Indian tribes was one which the treaty-making power derived from a source higher than an act of congress, towit, the constitution. And by this power the president and senate of the United States could make a treaty with any Indian tribe, extending to all objects which, in the intercourse of nations, had usually been regarded as the proper subject of negotiation and treaty, if not inconsistent with the nature of our government, and the relation between the states and the United States. This treaty-making power could make a sale or grant of land without an act of congress. It could lawfully provide that a patent should issue to convey lands which belong to the United States without the consent of congress, and in such case the grantee would have a good title. Holden v. Joy, 17 Wall. [84 U. S.] 247; U. S. v. Brooks, 10 How. [51 U. S.] 442; Meigs v. McClung, 9 Cranch [13 U. S.] 11.

Congress has no constitutional right to interfere with rights under treaties, except in cases purely political. Holden v. Joy, 17 Wall. [84 U. S.] 247; Wilson v. Wall, 6 Wall. [73 U. S.] 89; Insurance Co. v. Carter, 1 Pet. [26 U. S.] 542; Doe v. Wilson, 23 How. [64 U. S.] 461; Mitchell v. U. S., 9 Pet. [34 U. S.] 749; The Kansas Indians, 5 Wall. [72 U. S.] 737; 2 Story, Const. § 1508; Foster v. Neilson, 2 Pet. [27 U. S.] 254; Crews v. Burcham, 1 Black [66 U. S.] 356; Worcester v. Georgia, 6 Pet. [31 U. S.] 562; Blair v. Pathkiller's Lessee, 2 Yerg. 407; Harris v. Barnett, 4 Blackf. 369. If title passed by the treaty of 1833, there were no restrictions upon it.

But it may be asked how could this title be held to be a title in fee when the word "heirs" was not used in the grant. At the common law, by a rule which in this country is purely technical, the word "heirs" is necessary. But this rule did not apply to grants to a corporation aggregate. The fee passed without the words "heirs or successors," because in judgment of law a corporation never dies, and is immortal by means of perpetual succession. 4 Kent, Comm. 7. This tribe of Indians may be regarded under the law as a corporation aggregate. It has been claimed by some that this title obtained under the treaty of 1833 could not be a fee-simple title because it was taken under the general law prohibiting the alienation of Indian lands, and that this was such a restriction upon the title as to take away its fee-simple character. But this act was not in existence until the 30th day of June, 1834. But it is said the treaty of 1833 did not operate to convey the lands described therein. This point is not entirely free from doubt. But it does seem to me that the words used in the 1st section of the treaty are sufficient to op-

erate as a cession of the land mentioned in the treaty: "The United States agrees to possess the Cherokees, and to guarantee to them forever, and that guarantee is hereby pledged, of seven millions of acres of land." The United States agrees to possess what? Why, the land described. And to guarantee what, and for how long? Why, not the possession, but the land, and forever. It does seem to me that this was a cession of the land described. This opinion is confirmed by the language of the 2d article of the treaty of 1835. Rev. Ind. Treat. 68. It is: "The United States also agrees that the lands above, ceded by the treaty of February 14th, 1833." This language is a recognition of the cession of the lands. If they had already been ceded to the Cherokees forever by the treaty of 1833, then the agreement by the United States, by the 3d article of the treaty of 1835, to give them a patent for these lands, according to the provisions of the act of congress of May 28, 1830, was a mere nudum pactum. It was an attempt to place a restriction upon a title which had already passed, and which, according to the 1st section of the treaty of 1833, was to be evidenced by patent.

I am unable to see what consideration passed to the Indians to induce them to take a title of less grade, under the 3d article of the treaty of 1835, when they, by the terms of the 1st article of the treaty of 1833, had one of a higher grade. Now, unless the treaty was afterwards modified by some other treaty or law, and my construction of it is the correct one, it cannot be held that these lands of the Cherokees are "lands of the United States," in the sense of the language of section 5388 of the General Statutes. Although the construction may be at fault, still it throws some light on what must have been intended by the treaty of 1835.

But suppose the condition contained in the patent is valid—let us see what effect that has upon the title. The condition is that the lands revert to the United States if the said Cherokees become extinct or abandon the same. Now, the first of these conditions is one which would be silently engrafted on the grant independent of any express words. When there is a grant, and the grantee and his heirs become extinct, the land escheats to the state, whether the grantee be an individual or a body of individuals. In an ordinary patent, absolute from the government, the implied right of escheat to the sovereign lies behind the patent. In this case it is expressed. Therefore, that expressed condition does not take away the character of a fee-simple title. But the other one, against abandonment, does. This leaves the title less than a fee. But what character does it have? Blackstone (book 2. c. 7. p. 109) says: "A base or qualified fee is such a one as hath a qualification subjoined thereto, and which must be determined whenever the qualification annexed to it is at an end. As in the

case of a grant to A. and his heirs, tenants of the manor of Dale. In this instance, whenever the heirs of A. cease to be tenants of the manor the grant is entirely defeated. * * * This estate is a fee, because by possibility it may endure forever in a man and his heirs. Yet, as that duration depends upon the concurrence of collateral circumstances which qualify and debase the purity of the donation, it is, therefore, a qualified or base fee." Chancellor Kent (volume 4, p. 10, of his Commentaries) says: "A qualified, base, or determinable fee is an interest which may continue forever, but the estate is liable to be determined without the aid of a conveyance, by some act or event, circumscribing its continuance or extent. It is the uncertainty of the event, and the possibility that the fee may last forever, that renders the estate a fee, and not merely a freehold." If the condition attached to the fee is one which is certain to happen, then there is a reversion. If such condition is one which may never happen, there is not a reversion, but only a possibility of reversion. 4 Kent, Comm. 9; 1 Washb. Real Prop. p. 90, pl. 86–88. Mr. Washburn (in vol. 1, pl. 88, p. 90) says: "If the estate be to 'A. and his heirs till B. comes back from Rome, the right to have it when he comes back is not a reversion, but a mere possibility. He may not come back, and if he were to die before he came back, the estate would become absolute in the grantee."

Here is a grant made to the Cherokees, having conditions which may never happen, and, in view of the facts that the Cherokee Indians are not likely to become extinct, and that they are now occupying the lands, with no intention of abandoning the same, there is only a remote possibility of either event happening. In such case there is not an absolute right of reversion in the United States, but only a possibility of reversion. There is a broad distinction between the rights of the grantee in case of a reversion and a mere possibility of reversion. When there is only a possibility of reversion, all the estate is in the feoffee, notwithstanding the qualification. 4 Kent, Comm. 11; 2 Bouv. Inst. § 1699, p. 220; 1 Washb. Real Prop. pl. 89, p. 90. This Indian title being a base, qualified, or determinable fee, with only the possibility of a reversion, and not the right of reversion, in the United States, all the estate is in the Cherokee Nation of Indians. I cannot, therefore, see how these lands, which have been depredated upon, can be held to be "lands of the United States," in the sense of the language used in section 5388.

It must be remembered that this is a penal statute, and it must, therefore, be construed strictly. In the office of the interpretation of statutes, courts, particularly in statutes that create crimes, must closely regard and ever cling to the language which the legislature has selected to express its purpose. And when the words are not technical, or words

of art, the presumption is a reasonable and strong one that they were used by the legislature in their ordinary, popular, and general signification. Statutes enjoin obedience to their requirements, and, unless the contrary appears, it is to be taken that the legislature did not use the words in which its commands are expressed in any unusual sense. Therefore, the law is settled that in construing statutes the language used is never to be lost sight of, and the presumption is that the language used is used in no extraordinary sense, but in its common, every-day meaning. The legitimate function of courts is to interpret the legislative will, not to supplement it or to supply it. The judiciary must limit themselves to explaining the law; they cannot make it. It belongs only to the legislative department to create crimes and enjoin punishments. Accordingly, courts, in the construction of statutable offences, have always regarded it as their plain duty cautiously to keep clearly within the expressed will of the legislature, as otherwise they may hold an act or an omission to be a crime, and punish it, when, in fact, the legislature had never so intended. U. S. v. Clayton [Case No. 14,814]. Statutes creating crimes will not be extended by judicial interpretation to cases not plainly and unmistakably within their terms. If there is a fair doubt whether the act charged in the indictment is embraced in the criminal prohibition, that doubt is to be resolved in favor of the accused. U. S. v. Whittier [Id. 16,688]; U. S. v. Morris, 14 Pet. [39 U. S.] 694; U. S. v. Wiltberger, 5 Wheat. [18 U. S.] 76; U. S. v. Sheldon, 2 Wheat [15 U. S.] 119; U. S. v. Clayton, supra. Therefore, in the face of these principles of the law so well sustained by authorities, if it does not clearly appear to the judicial mind that these lands granted to the Cherokee Indians are "lands of the United States," in the sense intended by its makers to be attached to the statute, then the act of the defendant is not one covered by the terms of the law. and he is not subject to its penalty. It is to be regretted that it cannot be held to be an offence, as the complaints of depredations upon the timber of the Indian lands are constantly being made to officers of this court. There is a class of men on the borders of the Indian country who revel in the idea that they have an inherent, natural right to steal from the Indians. This right is not to be questioned. They think it a tyrannical use of authority if they are interfered with.

There should be a law enacted, the penalty of which would teach persons that Indians have rights which should be respected as well as the rights of citizens. This is with the law-making power, and not with this court. That it is the right of congress to pass a law protecting the timber on the lands of these people, is clear; the duty of congress to do so, in the face of the pledges of the government of the United States, made by her treaties and her laws, to protect these Indians from unlawful intrusions from without, and from violations of their rights by any and all persons, is manifest.

If the law-making power will give us a law, we will lay its mailed hand upon its violators in such a way that the timber in that Indian territory will be protected from the rapacity of those who are now stealing it. It remains with us to execute the law, not to make it. And it is with regret that we must hold in this case that the offence, for the reasons already given, is not within the terms of section 5388. The demurrer is, therefore, sustained. Judgment accordingly.