STATE, RESPONDENT, *v.* BIG SHEEP, APPELLANT.

(No. 5,803.)

(Submitted January 5, 1926. Decided January 26, 1926.)

[243 Pac. 1067.].

*Indians — Criminal Offenses — Jurisdiction of Federal and State Courts—Poisons—Narcotics—Illegal Possession—Constitution—Religious Societies.*

Indians—Criminal Offenses—Courts—Jurisdiction.
   1.  Where a state court has jurisdiction of a criminal offense committed by an Indian within a county in which an Indian reservation is situated, the state need not allege in the complaint or information that it was not committed upon land within the exclusive jurisdiction of the United States, that being a matter to be taken advantage of at the trial.

Same—Indian Allottees—When Subject to State Laws, When not.
   2.  An Indian allottee who has obtained citizenship through being an allottee and has received patent in fee is subject to the civil and

---

2.  Indians as subject to state regulation, see notes in 13 **Ann. Cas.** 192; Ann. Cas. 1914B, 652; Ann. Cas. 1915D, 371.

。 [75 Mont. 219.]

criminal laws of the state, but an allottee who has not obtained patent is still a ward of the federal government although a citizen and as such subject to the exclusive jurisdiction of the United States.

Same—Maintaining Tribal Relations—Federal Jurisdiction.

3. If an Indian is not an allottee but is a member of an Indian tribe who has not adopted the habits of civilized life and maintaining tribal relations under the supervision of an Indian agent, he is a ward of the government and subject to federal jurisdiction for acts committed by him within the reservation.

Same—Misdemeanor—When State has Jurisdiction.

4. If an act was committed by an Indian who is a ward of the federal government, upon land to which the United States has relinquished title, the state has jurisdiction to punish him for committing a misdemeanor not embraced within the jurisdiction of the United States.

Same—Citizenship—Effect on Jurisdiction of State for Offense Committed on Reservation.

5. Where an .Indian to whom full citizenship has been granted commits an offense against the penal statutes of the state, he may not defend against the power of the state to punish by asserting that the offense was committed in the house of an Indian, title to whose land is still within the United States.

Constitution — Religious Worship — Use of Narcotics for Sacramental Purposes—Legislature may Prohibit.

6. *Held,* that section 4, Article III of the state Constitution, guaranteeing the free exercise and enjoyment of religious profession and worship, is not in conflict with any provision of the federal Constitution, and that such provision cannot be invoked as a protection against legislation enacted by Chapter 22, Laws of 1923, prohibiting the unlawful possession of peyote (a narcotic), under the claim that the drug was possessed for use by members of a church to which defendant belonged, for sacramental purposes.

[1]   Indians, 31 **C. J.,** sec. 136, p. 540, n. 88.
[2]   Indians, 31 **C. J.,** sec. 33, p. 492, n. 17, 20; sec. 130, p. 539, n. 68, 69.
[3]   Indians, 31 **C. J.,** sec. 33, p. 492, n. 11; sec. 128, p. 538, n. 56.
[4]   Indians, 31 **C. J.,** sec. 121, p. 534, n. 99; sec. 130, p. 539, n. 68.
[5]   Indians, 31 **C. J.,** sec. 128, p. 538, n. 61.
[6]   Constitutional Law, 12 **C. J.,** sec. 453, p. 944, n. 85.   Poisons, 31 Cyc., p. 899, n. 22 New.

*Appeal from District Court, Big Horn County; O. F. Goddard, Judge.*

BIG SHEEP was convicted of unlawful possession of peyote and appeals from the judgment and an order denying him a new trial.   Reversed and remanded.

3.   See 14 **R. C. L.** 142.
4.   See 14 **R. C. L.** 143.

*Messrs. Guinn & Maddox,* for Appellant, submitted a brief; *Mr. C. C. Guinn* argued the cause orally.

The court erred in rejecting the evidence on behalf of the defendant relating to the religious use of the peyote charged to have been in his possession. It was sought therein to prove that he had this peyote in his possession for purely religious purposes and for no other use; that he was a member of a church called the Native American Church, chartered in Oklahoma and organized on the Crow and Cheyenne Indian Reservations, Montana; that certain formalities as to its use were a part of the discipline of that church and that its use was founded upon certain verses of the Scriptures. The defendant, as well as all other persons, had the right to worship a supreme being according to the dictates of his own conscience. This is guaranteed by both the Constitution of the nation and of the state. (Art. III, sec. 4, Constitution, State of Montana; Art. I, Amendments to Constitution of U. S.; Art. VI, Constitution U. S.; sec. 10532, Rev. Codes 1921.)

It has been held repeatedly that the federal courts have exclusive jurisdiction over Indian reservations and offenses committed thereon by Indians against Indians or by Indians against whites. (*United States* v. *Kagama,* 118 U. S. 375, 30 L. Ed. 228, 6 Sup. Ct. Rep. 1109 [see, also, Rose's U. S. Notes] ; *United States* v. *Thomas,* 151 U. S. 577, 38 L. Ed. 276, 14 Sup. Ct. Rep. 426; *Donnelly* v. *United States,* 228 U. S. 243, Ann. Cas. 1913E, 710, 57 L. Ed. 820, 33 Sup. Ct. Rep. 449 [see, also, Rose's U. S. Notes] ; *United States* v. *Monte,* 3 N. M. 126, 3 Pac. 45.) The state courts have no jurisdiction of crimes committed by an Indian within the limits of an Indian reservation. (*Toy Toy* v. *Hopkins,* 212 U. S. 542, 53 L. Ed. 644, 29 Sup. Ct. Rep. 416 [see, also, Rose's U. S. Notes] ; *United States* v. *Kagama, supra; State* v. *Campbell,* 53 Minn. 354, 21 L. R. A. 169, 55 N. W. 553; *People* v. *Daly,* 212 N. Y.

183, Ann. Cas. 1915D, 367, 105 N. E. 1048.) And the federal jurisdiction is not affected by the fact that the Indian committing the crime had been granted citizenship. (*Apapas* v. *United States*, 223 U. S. 587, 58 L. Ed. 104, 34 Sup. Ct. Rep. 704 [see, also, Rose's U. S. Notes].) No Act of the state can withdraw Indians from the influence of an Act of Congress so as to confer jurisdiction to the state. (*United States* v. *Holliday*, 70 U. S. 407, 18 L. Ed. 182 [see, also, Rose's U. S. Notes].)

Unless jurisdiction exists the judgment is not due process of law and is ineffective for any purpose, and all proceedings founded thereon are invalid. (15 R. C. L. 842; *Ex parte Davis*, 33 Nev. 309, 110 Pac. 1131; *Ex parte McClure*, 6 Okl. Cr. 241, 118 Pac. 591; 1 Black on Judgments, 218.)

Defendant offered to prove by competent evidence that peyote is a drug. The purpose in offering such proof was to further show that if it was a drug and in a certain class of drugs, then the federal government had at the time the alleged offense was said to have been committed exercised control over its sale and use on Indian reservations under the Harrison Act, and having exercised such authority it had exclusive jurisdiction of the subject matter and that the state Act could not have any effect on Indian lands. The defendant was not allowed to prove this, but, nevertheless, we think this court can take judicial notice that peyote is a drug and of the Harrison Act and other laws controlling its use. (15 R. C. L. 1103, 1109.)

*Mr. L. A. Foot*, Attorney General, and *Mr. S. R. Foot*, Assistant Attorney General, for the State, submitted a brief; *Mr. S. R. Foot* argued the cause orally.

The fact that appellant had peyote in his possession for religious purposes in conformity with his religious belief would not justify his act, and the evidence to that effect was properly rejected by the trial court. The regulation of

the use of peyote, which contains a narcotic stimulating substance, comes within the police power of the state, and laws regulating the use of it are not unconstitutional as interfering with religious freedom. (6 R. C. L. par. 237, p. 251; *Davis* v. *Beason,* 133 U. S. 333, 33 L. Ed. 637, 10 Sup. Ct. Rep. 299 [see, also, Rose's U. S. Notes]; *Commonwealth* v. *Plaisted,* 148 Mass. 375, 12 Am. St. Rep. 566, 2 L. R. A. 142, 19 N. E. 224; *State* v. *Marble,* 72 Ohio, 21, 106 Am. St. Rep. 570, 2 Ann. Cas. 898, 70 L. R. A. 835, 73 N. E. 1063; *Renolds* v. *United States,* 98 U. S. 145, 25 L. Ed. 244; *Smith* v. *People,* 51 Colo. 270, 36 L. R. A. (n. s.) 158, 117 Pac. 612.)

The district court had jurisdiction over the offense charged and over the person of the defendant.

We agree with counsel for appellant that there are decisions to the effect that the state courts have no jurisdiction in cases of this kind. Most, if not all, of the decisions so holding have been founded upon the rules and principles of law set forth in the opinion of Chief Justice Marshall in the case of *Cherokee Nations* v. *Georgia,* 30 U. S. 1, 8 L. Ed. 25 [see, also, Rose's U. S. Notes]. One of the principal reasons for denying the state jurisdiction over Indians and over offenses committed by Indians on reservations in the above case was that the Indian was neither a citizen of the United States nor of any state, but simply a ward of the government. However, this policy began to change with the signing of treaties providing for allotments and resulted in the Act of February 8, 1887, known as the "Dawes Act," 24 Stats. at Large, 389. (*In re Heff,* 197 U. S. 448, 49 L. Ed. 848, 25 Sup. Ct. Rep. 506.)

By the Dawes Act, all Crow Indians receiving allotments under the Act of April 11, 1882, were emancipated from federal control and made subject to the laws, both civil and criminal, of the state of Montana. Congress had no power to recall the grant made by the Dawes Act, as to any Indians

to whom allotments had been made prior to the amendment thereof. (*State* v. *Lott,* 21 Idaho, 646, 123 Pac. 491; *In re Heff, supra.*) There is nothing in the record to show that the defendant had not received his allotment under the Act of April 11, 1882, prior to the amendment thereof by the Act of May 8, 1906, nor was any offer of such proof made to the trial court; therefore, the defendant had the same status as though he had received a patent in fee for his land, and the courts have repeatedly held that where a patent in fee has been issued to an Indian he becomes subject to the jurisdiction of the state courts. (*Louie* v. *United States,* 274 Fed. 47; *United States* v. *Hall,* 171 Fed. 214; *United States* v. *Kiya,* 126 Fed. 879; *In re Now-Ge-Zuch,* 69 Kan. 410, 76 Pac. 877.)

All Indians are now citizens of the United States and the state wherein they reside, with the right to vote and enjoy all other benefits and privileges of citizenship. ''He no longer depends upon the feeble support of his tribe for the preservation of his rights of person and property, he is now surrounded with the protection of the law and entitled to the benefit of the new order of things.'' (*Keokuk* v. *Ulam,* 4 Okl. 5, 38 Pac. 1080.) This being the present status of the Indian, he must be amenable to the laws of the state and within the jurisdiction of the state courts.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

By the provisions of an Act of the Eighteenth Legislative Assembly it is unlawful for any person to sell, furnish or give away or offer to sell, furnish or give away, or to have in his possession, peyote (pellote), botanically known as *Lophophora Williamsii.* A person who violates the Act is guilty of a misdemeanor and upon conviction is subject to a fine of not exceeding $500 or imprisonment in the county

jail for a period of not to exceed six months, or to both such
fine and imprisonment.   (Chap. 22, Sess. Laws 1923, p. 40.)

By complaint filed in the justice's court of Hardin township
in Big Horn county, the defendant Big Sheep was charged
with the crime of unlawfully having in his possession peyote
on or about the ninth day of November, 1924, in the county
of Big Horn, state of Montana.   The sufficiency of the com-
plaint is not in question.   Evidently the case was appealed,
because on March 4, 1925, it came on for trial in the district
court.

Objection was made seasonably to the jurisdiction of the
court on the ground that the defendant, at the time and place
mentioned in the complaint, was an Indian, a member of the
Crow Tribe, and that the acts alleged to constitute the offense
were done upon land within the Crow Indian Reservation,
the title to which still remained in the United States.

Want of jurisdiction in the court, if want there was, did
[1]  not appear upon the face of the complaint.   The jus-
tice's court had jurisdiction of the misdemeanor charged if
committed within Big Horn county, unless upon land within
the exclusive jurisdiction of the United States.   It was not
necessary to negative the exception, as it was not a con-
stituent part of the offense; that was a matter to be taken
advantage of at the trial.   Upon the conditions above stated
the rule announced in *State* v. *Spotted Hawk*, 22 Mont. 33,
55 Pac. 1026, and *State* v. *Tully*, 31 Mont. 365, 3 Ann. Cas.
824, 78 Pac. 760, applies.   (And see *State* v. *Buckaroo Jack*,
30 Nev. 325, 96 Pac. 497.)

However, this objection was lodged at different times dur-
ing the trial and always overruled.   The defendant offered
to prove that he was at the time alleged, and for many years
theretofore had been, a member in good standing of the
Native American Church, and that peyote is used by the mem-
bers of that church "for sacramental purposes only in the
worship of God according to their belief and interpretation

75 Mont.—15

of the Holy Bible, and according to the dictates of their conscience; and that peyote is never used by members of that church except in the worship of God.'' They ground their faith upon the Fourteenth Chapter of Romans, the Fifty-third Chapter of Isaiah, second verse, and the Second Chapter of Revelations, seventeenth verse, King James' Version. The offer was denied.

At the conclusion of the trial the defendant was found guilty as charged and sentenced to pay a fine of $100. His motion for a new trial was denied, whereupon he appealed from the order denying that motion and from the judgment.

1. That the defendant was in the possession of peyote at the home of Austin Stray Calf, which is seven miles south of Hardin within the Crow Indian Reservation, and that defendant is a member of the Crow Tribe is conceded.

The state did not offer any proof to show that title to the land possessed by Austin Stray Calf had passed from the United States. Defendant offered to prove that it had not. The offer was denied. It is evident that the trial court deemed evidence upon the point immaterial.

The question presented is of first impression in this court: May the state in the enforcement of its penal statutes punish an *Indian for an act committed by him upon the reservation?

At the outset it is important to note that the offense charged was not committed by defendant against another Indian, nor against the laws of the United States. If committed at all it was against the laws of the state of Montana.

It may prove useful to trace briefly the history of the policy of the government with respect to the numerous and once powerful tribes which occupied this soil before the advent of the white man. The framers of the federal Constitution were sensible of problems ahead with respect to the Indians.

How they regarded the status of the tribes is not clear, in view of the clause which gave Congress power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." (United States Constitution, Art. I, sec. 8, cl. 3.)

The status of the tribes came before the United States supreme court in the great case of *Cherokee Nations* v. *Georgia,* 5 Pet. 1, 8 L. Ed. 25, in which Chief Justice Marshall said they might be denominated domestic dependent nations. "Their relation to the United States resembles that of a ward to his guardian." This became an established doctrine, which is still, to some extent at least, in full force and vigor. (*United States* v. *Kagama,* 118 U. S. 375, 30 L. Ed. 228, 6 Sup. Ct. Rep. 1109 [see, also, Rose's U. S. Notes Supp.]; *United States* v. *Nice,* 241 U. S. 591, 60 L. Ed. 1192, 36 Sup. Ct. Rep. 696; *Cramer* v. *United States,* 261 U. S. 219, 67 L. Ed. 622, 43 Sup. Ct. Rep. 342.)

The United States has always maintained its primary sovereignty over the soil. And while asserting sovereignty over the Indians themselves, the government for nearly 100 years entered into treaties with the various tribes. In 1871 this time-honored policy was changed by Congress which then asserted the right to legislate for and concerning the Indians directly.

"No Indian nation or tribe within the Territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March third, eighteen hundred and seventy-one, shall be hereby invalidated or impaired." (16 Stats. at Large, 566; 5 Comp. Stats. sec. 4034.)

As early as 1862, if not before, Congress initiated the policy of allotting lands in severalty to certain Indians who were qualified and desired to receive such, with the promise that

patent and citizenship eventually should follow. (13 Stat. 623; XIX Opinions of Attorneys General, 255.) This policy was afterwards described by Mr. Justice Brewer as one "which looks to the breaking up of tribal relations, the establishing of the separate Indians into individual homes, free from national guardianship, and charged with all the rights and obligations of citizens of the United States." (*In the Matter of Heff,* 197 U. S. 488, 49 L. Ed. 848, 25 Sup. Ct. Rep. 506.)

The territory of Montana was organized by Act of Congress approved May 26, 1864 (13 Stat. 85). In 1868 the Crow Indian Reservation, based upon a treaty with that tribe, was created, composed of land constituted wholly within the geographic boundaries of Montana. (15 Stat. 649.) In the treaty the allotment policy was recognized to a limited extent, but citizenship was not mentioned. An alteration of this treaty was effected by an agreement which was ratified by Act of Congress April 11, 1882 (22 Stat. 42), by the terms of which the Crows relinquished to the United States large portions of the territory comprehended within the treaty of 1868. The Crow Tribe still lives upon its reservation, receives bounty from the government, and is under the superintendency of a governmental agent who resides at Crow Agency.

In the agreement of 1882 specific provisions were made respecting allotments, but as before nothing was said respecting citizenship. So far as the Crows are concerned that privilege came to them under the Dawes Act: "An Act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes." (24 Stat. 388.) Section 6 of the Act provided in part that, upon the completion of the allotments and the patenting of the lands to the allottees, "each and every member of the respective bands or tribes

of Indians to whom allotments have been made shall have
the benefit of and be subject to the laws, both civil and
criminal, of the state or territory in which they may re-
side; * * * and every Indian born within the territorial
limits of the United States to whom allotments shall have
been made under the provisions of this Act, or under any
law or treaty, and every Indian born within the territorial
limits of the United States who has voluntarily taken up,
within said limits, his residence separate and apart from
any tribe of Indians therein, and has adopted the habits of
civilized life, is hereby declared to be a citizen of the United
States, and is entitled to all the rights, privileges, and im-
munities of such citizens, whether said Indian has been or
not, by birth or otherwise, a member of any tribe of Indians
within the territorial limits of the United States without in
any manner impairing or otherwise affecting the right of any
such Indian to tribal or other property.''

There was controversy for a time over the limitation of the
trust period fixed in the Act and as to when the allottee be-
came a citizen, but this was set at rest by the Act of May 8,
1906, which amended the law so as distinctly to postpone to
the expiration of the trust period the subjection of allottees
under that Act to state laws. The first part of this section
as amended is: ''That at the expiration of the trust period
and when the lands have been conveyed to the Indians by
patent in fee, as provided in section five of this Act, then each
and every allottee shall have the benefit of and be subject
to the laws, both civil and criminal, of the state or territory
in which they may reside.'' And at the same time there was
added the explicit proviso: ''That until the issuance of fee-
simple patents all allottees to whom trust patents shall here-
after be issued shall be subject to the exclusive jurisdiction
of the United States.'' (24 Stat. 390, 34 Stat. 182, now sec.
4203, U. S. Comp. Stats.) Commenting upon these laws the
United States supreme court, speaking through Mr. Justice

Hughes, in *United States* v. *Pelican,* said: "We deem it to be clear that Congress had the power thus to continue the guardianship of the government." (232 U. S. 442, 58 L. Ed. 676, 34 Sup. Ct. Rep. 396 [see, also, Rose's U. S. Notes].)

By Act approved June 2, 1924 (U. S. Comp. Stats. Supp. 1925, sec. 3951aa), Congress declared: "That all noncitizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States: Provided, that the granting of such citizenship shall not in any manner impair or otherwise affect the right of any Indian to tribal or other property." What, if any, effect has this enactment upon the problem before us?

In *United States* v. *Waller,* 243 U. S. 452, 61 L. Ed. 843, 37 Sup. Ct. Rep. 430 [see, also, Rose's U. S. Notes Supp.] the court said: "The tribal Indians are wards of the government, and as such under its guardianship. It rests with Congress to determine the time and extent of emancipation. Conferring citizenship is not inconsistent with the continuation of such guardianship, for it has been held that even after the Indians have been made citizens the relation of guardian and ward for some purposes may continue. On the other hand, Congress may relieve the Indians from such guardianship and control, in whole or in part, and may, if it sees fit, clothe them with full rights and responsibilities concerning their property or give to them a partial emancipation if it thinks that course better for their protection. (*United States* v. *Nice,* 241 U. S. 591, 598, 60 L. Ed. 1192, 36 Sup. Ct. Rep. 696 [see, also, Rose's U. S. Notes Supp.], and cases cited.)"

This doctrine the federal courts have maintained consistently. (See *Cramer* v. *United States, supra; Brown* v. *United States* (C. C. A.), 8 Fed. (2d) 433.)

On the other hand it is clear that an Indian who has obtained patent in fee to his allotment not only is a citizen of the United States, but has all the rights, privileges and immunities of citizens of the United States, and is subject to the

civil and criminal laws of the state of Montana. He is no longer a ward of the government. His allotment is free from governmental restraint and control.

But has this state any criminal jurisdiction over an Indian, though a citizen, who still retains tribal relations within the Crow Reservation and who commits an act within the reservation, which, if done within the jurisdiction of this state, would be criminal under its laws?

As they were required to do by the Enabling Act, the people of Montana annexed an ordinance to our Constitution (Ordinance No. 1, division 2d), in which it was declared: ''That the people inhabiting the said proposed state of Montana do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States. * * * '' So it is plain that Congress always had and still has absolute jurisdiction and control over all lands within the Crow Reservation to which title has not been extinguished by the United States.

By reason of its guardianship over Indians maintaining tribal relations—its ''dependent people'' (*United States* v. *Kagama, supra; Hallowell* v. *United States,* 221 U. S. 317, 55 L. Ed. 750, 31 Sup. Ct. Rep. 587 [see, also, Rose's U. S. Notes]), the United States has always asserted its own, and has denied the power of the states, over them. Quickly following the decision in *Cherokee Nations* v. *Georgia,* the supreme court in *Worcester* v. *Georgia,* 6 Pet. 515, 8 L. Ed. 483, declared that ''Though the Indians had by treaty sold their land within that state, and agreed to remove away, which they had failed to do, the state could not, while they re-

mained on those lands, extend its laws, criminal and civil, over the tribes; that the duty and power to compel their removal was in the United States, and the tribe was . under their protection, and could not be subjected to the laws of the state and the process of its courts. The same thing was decided in the case of *Fellows* v. *Blacksmith & Others,* 19 How. 366, 15 L. Ed. 684 [see, also, Rose's U. S. Notes]."

The foregoing quotation is taken from the opinion of Mr. Justice Miller, in *United States* v. *Kagama, supra,* in which the foregoing doctrine is emphasized. In that case the court was considering the effect of an Act of Congress giving jurisdiction to the courts of the territories of the crimes of murder, manslaughter, rape, assault with intent to kill, arson, burglary and larceny, committed by Indians within the territories, and in like cases to courts of the United States for the same crimes committed by an Indian against the person or property of another Indian or other person within the limits of a state, but on an Indian reservation.    (23 Stat. 362, sec. 9, now U. S. Comp. Stats., sec. 10502.)

Prior to that enactment the United States had not undertaken to punish Indians for crimes committed between themselves (note the abortive attempt in *Ex parte Crow Dog,* 109 U. S. 556, 27 L. Ed. 1030, 3 Sup. Ct. Rep. 396 [see, also, Rose's U. S. Notes], which gave rise to the Act above mentioned) ; the Indians living under their tribal laws were permitted to regulate their own affairs. The Act did not interfere with the process of the state courts within the reservation, nor with the operation of state laws upon white people or others than Indians found there. Its effect was "confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation." (*United States* v. *Kagama, supra; Draper* v. *United States,* 164 U. S. 240, 41 L. Ed. 419, 17 Sup. Ct. Rep. 107.) Furthermore, by that Act Congress enumerated all crimes committed by Indians against Indians which in its judgment

should be cognizable by the territorial and United States courts. (*State* v. *Campbell,* 53 Minn. 354, 21 L. R. A. 169, 55 N. W. 553.)

The United States did not attempt, nor has it ever attempted, to punish its wards for crimes committed within the limits of a state but outside a reservation. Even before he became a citizen, if an Indian committed a crime within this state, and without his reservation, he was held amenable to our laws, and subject to the jurisdiction of our courts. (*State* v. *Spotted Hawk, supra; State* v. *Little Whirlwind,* 22 Mont. 425, 56 Pac. 820; and see *Pablo* v. *People,* 23 Colo. 134, 37 L. R. A. 636, 46 Pac. 636; *Ex parte Moore,* 28 S. D. 339, Ann. Cas. 1914B, 648, 133 N. W. 817; *State* v. *Buckaroo Jack; supra.*)

We then arrive at the precise question at bar: Has the state jurisdiction to punish the defendant for committing a misdemeanor which the United States has never assumed to embrace within its jurisdiction? The answer may be treated under four heads:

(1) If the defendant obtained his citizenship through being an allottee who has obtained a patent in fee, the inquiry must be answered in the affirmative. In such case he is subject to the laws, both civil and criminal, of this state. (U. S. Comp Stats., sec. 4203; *Smith* v. *Northern Pac. Ry. Co.,* 57 Mont. 14, 186 Pac. 684; *Kitto* v. *State,* 98 Neb. 164, L. R. A. 1915F, 587, 152 N. W. 380.)

(2) If he is an allottee who has not obtained patent in fee, he is still a ward of the government, although a citizen, and under the provisions of section 4203, unquestionably is "subject to the exclusive jurisdiction of the United States." Here a negative answer follows. So far as acts committed by him within the reservation may be brought in question, it will be noted that the latter part of that section does not confine jurisdiction to property rights. It was evidently enacted pursuant to the government's guardian and ward policy with

respect to the Indians who had not yet been fully emancipated.

(3) If defendant is not an allottee but is a member of the [3] Crow Tribe who has not adopted the habits of civilized life but is still maintaining his tribal relations under the supervision of the Crow Indian agent, he must be deemed a ward of the government, and subject to federal jurisdiction for acts committed by him within the reservation. Here, too, the answer is in the negative.

(4) If defendant is a ward of the government and the act [4] was committed by him upon land to which the United States has relinquished title the state has jurisdiction, and the answer must be in the affirmative.

Lands to which the United States has parted with title and over which it no longer exercises control, even if within the exterior boundaries of the reservation, are not deemed a part of the reservation. All other lands within the reservation boundaries are. What jurisdiction, if any, the United States may assert over lands within the boundaries of a reservation to which it has relinquished title completely—by reason of the fact that such lands lie within the reservation boundaries—is a matter into which we need not now inquire. Some general observations relevant to the subject are appropriate.

The United States courts have always asserted jurisdiction over Indians living on and maintaining tribal relations within their reservations, and whenever the question has been presented have denied the jurisdiction of the state courts over them (*United States* v. *Kagama, supra; Donnelly* v. *United States,* 228 U. S. 243, Ann. Cas. 1913E, 710, 57 L. Ed. 820, 33 Sup. Ct. Rep. 449 [see, also, Rose's U. S. Notes]; *In re Blackbird* (D. C.), 109 Fed. 139; *In re Lincoln* (D. C.), 129 Fed. 247; *Yohyowan* v. *Luce* (D. C.) 291 Fed. 425; *Quagon* v. *Biddle* (C. C. A.) 5 Fed. (2d) 608.)

Congress has the power, which to some extent it has exercised, to prohibit and punish acts denominated misdemeanors

within the reservations. A notable instance is the Act of January 30, 1897 (29 Stat. 506 [U. S. Comp. Stats., sec. 4137]), prohibiting the introduction of liquor into the Indian country. (See *Hallowell* v. *United States, supra; United States* v. *Sandoval*, 231 U. S. 28, 58 L. Ed. 107, 34 Sup. Ct. Rep. 1.) And it has been held that the power extends to regulating and prohibiting traffic in intoxicating liquor with tribal Indians within a state, whether upon or off an Indian reservation. (*United States* v. *Nice, supra*.) But this was upon the hypothesis that "these Indians are yet wards of the nation, in a condition of privilege or dependency, and have not been discharged from that condition." We have not overlooked sections 4148 and 4149 United States Compiled Statutes, but they have not any application to the present inquiry.

Let it be admitted that the United States still retains jurisdiction over the lands within the boundaries of the Crow Reservation to which it has not relinquished title, and over those Indians who have not been fully emancipated. But the United States does not assert exclusive jurisdiction for all purposes over such lands, as we have seen (*United States* v. *Kagama, supra*), nor does it ordinarily assert jurisdiction over tribal Indians without the reservation. Probably it would be more exact to say that the United States courts have always asserted federal jurisdiction, and denied state jurisdiction, over Indians who are wards of the government residing within Indian reservations.

It has been stated that it is generally held "that as to Indians on reservations set apart by the United States government, the civil and criminal laws of the states within whose boundaries the reservations are located do not apply, but the Indians are subject only to the laws of the United States government; and that, although an Indian becomes a full-fledged citizen of the United States, if he continues to live on a reservation he is nevertheless subject to the exclusive juris-

diction of the United States." (Note to *Ex parte Moore, supra,* Ann. Cas. 1914B, 652.)

But we think upon an analysis of the decisions cited (*United States* v. *Celestine,* 215 U. S. 278 54 L. Ed. 195, 30 Sup. Ct. Rep. 93 [see, also, Rose's U. S. Notes]; *United States* v. *Sutton,* 215 U. S. 291, 54 L. Ed. 200, 30 Sup. Ct. Rep. 116; *Donnelly* v. *United States, supra*)—and to these might be added *United States* v. *Pelican, supra, United States* v. *Nice, supra,* and *United States* v. *Sandoval, supra*—it is clear that the supreme court has not intended to imply that the government has any special jurisdiction over an Indian who has been fully emancipated. These decisions are grounded wholly upon the duty which the government owes to its dependent peoples—its wards. The fully emancipated Indian is given the same consideration only as is accorded to any other citizen. (*United States* v. *Waller, supra.*)

The state courts generally have been in accord with the federal courts respecting these jurisdictional questions. (*State* v. *Campbell, supra; State* v. *Condon,* 79 Wash. 97, 139 Pac. 871; *State* v. *Columbia George,* 39 Or. 127, 65 Pac. 604; *People ex rel. Cusick* v. *Daly,* 212 N. Y. 183, 38 Ann. Cas. 367, 105 N. E. 1048.)

In *State* v. *Campbell, supra,* the court said: "By the Act of 1885, presumably, Congress has enumerated all the acts which in their judgment ought to be made crimes when committed by Indians, in view of their imperfect civilization. For the state to be allowed to supplement this by making every act a crime on their part which would be such if committed by a member of our more highly civilized society would be not only inappropriate, but also practically to arrogate the guardianship over these Indians which is exclusively vested in the general government. Moreover, it is very evident that the state never intended to attempt to extend its criminal laws over tribal Indians for acts committed within a reservation."

Incidentally, we do not find any pronouncement by the legislature indicating an attempt to extend the criminal laws of Montana over tribal Indians for acts committed within a reservation.

The supreme court of Oregon, speaking through Mr. Justice Wolverton, in *State* v. *Columbia George, supra,* observed: "That the government, while it has bestowed citizenship, has not thereby relinquished the guardianship of the tribes, indulging them yet a little while, but with greatly restricted authority, in their primitive government; and until the general government has taken its hands off, and relinquished supervision over its Indians, the state court cannot assume jurisdiction touching the criminal acts of one against the other."

A strange situation is thus created. The Indians upon the Crow Reservation were deemed worthy of citizenship and have been made citizens by Act of Congress. They enjoy all the rights, privileges and immunities of citizens of this state. Through their representatives they join in enacting laws for the government of this state and may jointly with other citizens initiate laws directly, and yet while still maintaining their tribal relations upon their reservation and under the supervision of their governmental agent, they may break with impunity the laws they make; but this is but one evidence of "the natural outgrowth of the anomalous attitude that the general government has maintained toward the Indian from the beginning." (*State* v. *Columbia George, supra.*)

Nothing said in the *Matter of Heff, supra,* militates against the foregoing. That case, however, in so far as it has to do with national guardianship over the Indians, was overruled in *United States* v. *Nice, supra.*

The decisions of state courts which appear to differ in some particulars from the holdings of the federal courts upon these questions either arise under circumstances different from those here presented, or, as in *Re Now-ge-zhuck,* 69 Kan. 410, 76 Pac. 877, *Kitto* v. *State, supra,* and in *State* v. *Doxtater,* 47

Wis. 278, 2 N. W. 439, fail to give due weight to the fact that the federal government has exercised, and has the right to exercise, sovereignty over its wards upon Indian reservations within a state.

We conclude, therefore, that if the defendant at the time he committed the act charged was a citizen of the United States, and not under federal restriction, as of guardiansip or if he committed the offense upon land to which the United States has relinquished title, he is subject to the jurisdiction of the courts of this state for the offense committed; otherwise he is not. (See (1), (2), (3), (4), *supra*.)

If he is an emancipated Indian, clothed in the full panoply [5] of citizenship, who has broken a state law, he may not defend against the power of the state by claiming as a sanctuary the house of Austin Stray Calf, although the title to that place is still in the United States. A white man could not commit the act with impunity there, and neither can Big Sheep simply because he is of Indian blood.

A question of fact is thus presented which makes it necessary to remand this cause for a new trial. If upon the new trial it shall appear that the court has jurisdiction to proceed, it will then be called upon to decide whether the fact [6] that defendant had peyote in his possession for religious purposes in conformity with his religious belief justified his act. Although considerable effort was spent upon this point in the trial of the case, it is not insisted upon with much seriousness in this court.

Section 4 of Article III of the Constitution provides: "The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed, and no person shall be denied any civil or political right or privilege on account of his opinions concerning religion, but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, excuse acts of licentiousness, by bigamous or polygamous marriage,

or otherwise, or justify practices inconsistent with the good order, peace, or safety of the state, or opposed to the civil authority thereof, or of the United States. No person shall be required to attend any place of worship or support any ministry, religious sect, or denomination, against his consent; nor shall any preference be given by law to any religious denomination or mode of worship." It is idle to urge that the foregoing provision is in conflict with any provision of the federal Constitution.

It was clearly within the power of the legislature to determine whether the practice of using peyote is inconsistent with the good order, peace and safety of the state. We do not find peyote or any like herb mentioned by Isaiah, or by Saint Paul in his Epistle to the Romans, nor does it seem from the language employed that Saint John the Divine had any such in mind. It is true that Isaiah speaks of a root out of a dry ground. There is a slight resemblance here, as peyote is said to be a product of the cactus plant. The Fourteenth Chapter of Romans is a lesson concerning brotherly charity. It teaches that men should not condemn one the other, but take heed that they give no offense. Second verse: "For one believeth that he may eat all things; another, who is weak, eateth herbs." Third verse: "Let not him that eateth despise him that eateth not; and let not him which eateth not judge him that eateth." These excellent precepts are worthy of much greater observation than they receive; but if carried to the length defendant insists upon, the use of opium, cocaine and even "moonshine" might be justified under the guise of religious observance.

The supreme court of the United States, in *Davis* v. *Beason*, 133 U. S. 333, 33 L. Ed. 637, 10 Sup. Ct. Rep. 299 [see, also, Rose's U. S. Notes], declared that it was never intended or supposed that the first amendment to the Constitution, that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof," should be invoked as a protection against legislation for the punishment of acts in-

imical to the peace, good order and morals of society. Ruling Case Law says that while laws cannot interfere with mere religious belief and opinions, they may inhibit acts or practices which tend toward the subversion of the civil government, or which are made criminal by the law of the land. (6 R. C. L. 251.) To the same effect, see *State* v. *Neitzel,* 69 Wash. 567, Ann. Cas. 1914A, 899, 43 L. R. A. (n. s.) 203, 125 Pac. 939.

For the reasons foregoing the judgment and order are reversed and the cause is remanded to the district court of Big Horn county with direction to grant the defendant a new trial.

*Reversed and remanded.*

ASSOCIATE JUSTICES HOLLOWAY, MATTHEWS, GALEN and STARK concur.