78 P.2d 145

**TRUJILLO v. PRINCE.**

No. 4342.

Supreme Court of New Mexico.

March 22, 1938.

Mechem & Hannett, and Donald B. Moses, all of Albuquerque, for appellant.

Kiker & Sanchez, of Santa Fe, for appellee.

William J. Barker, Sp. Asst. to Atty. Gen., amicus curiae.

BICKLEY, Justice.

Defendant is a citizen of the United States and a citizen and resident of the state of New Mexico, not an Indian and not living on an Indian reservation.

Decedent was a Nambe Pueblo Indian and his administrator is also a member of the same pueblo. Each resided on the Nambe Indian reservation in New Mexico and by the effect of congressional enactment are citizens of the United States, 8 U.S.C.A. § 3. It is charged that decedent, while driving an automobile on a public highway, was killed by a wrongful act of the defendant. Defendant answers with denials and by further separate and affirmative answer alleged:

"Antonio Trujillo, who in said amended complaint alleges that he is the administrator of the estate of Amadeo Trujillo, deceased, is a Nambe Indian, living upon the Nambe Indian Reservation in New Mexico, and is a subject of the Nambe Indian Tribal Government, and, except for the statutory regulations enacted by the Congress of the United States of America, is governed wholly and entirely by the tribal laws of the Nambe Indian Reservation.

"That Amadeo Trujillo, now deceased, as defendant is informed and believes, and so alleges, was in his lifetime a Nambe Indian, and a resident of the Nambe Indian Reservation in New Mexico; and was the subject of the Nambe Indian Tribal Government; and, except for laws and regulations enacted by the Congress of the United States of America, was governed solely by the Nambe Indian Tribal Government.

"That at the time of his death, the said Amadeo Trujillo owned no property subject to taxation under the laws of the state of New Mexico, or subject in any

way to the laws of the state of New Mexico; and that the said Amadeo Trujillo left no estate subject to administration under the laws of the state of New Mexico.

· "That the Probate Court of the state of New Mexico, was and is, without jurisdiction to appoint an administrator of the estate of the said Amadeo Trujillo, deceased, and said Probate Court has no jurisdiction whatever to make any orders concerning any property or effects left by the said Amadeo Trujillo at the time of his death.

"That the said Antonio Trujillo, because of want of jurisdiction in the Probate Court of the county of Santa Fe and state of New Mexico to appoint an administrator for the estate of Amadeo Trujillo, deceased, is not the duly appointed, qualified and acting administrator of the estate of the said Amadeo Trujillo, deceased, and can exercise no authority as such administrator."

Plaintiff demurred to defendant's further separate and affirmative answer and assigned the following grounds for said demurrer, to wit:

"That the plaintiff is a citizen of the United States; that the deceased was likewise a citizen of the United States; that Congress by making Indians citizens of the United States, intended that they should be subject to the laws of the state with respect to their property rights where the said property was not acquired by said Indians by virtue of any law of the United States or any treaty, but was a right created by state statute to which the said Indian or Indians are entitled.

"That this is a statutory action for wrongful death and that the administrator of the estate is designated to bring the action, and that said claim on account of said wrongful death is an asset of said estate for which the plaintiff was appointed to collect for the benefit of the heirs."

The demurrer was overruled, the plaintiff excepted to the ruling and declined to plead further and thereafter the judgment was entered from which this appeal is taken.

The question presented is, Does a New Mexico probate court have jurisdiction to appoint an administrator for a deceased reservation Indian to enforce the right of action created by the state Death by Wrongful Act Statute?

The case has been ably presented by counsel for the parties and by the Special Assistant to the Attorney General of the United States, as friend of the court. In addition to the argument and cases cited, we have been aided by the discussion contained in articles in legal periodicals as follows: "Nationals Without a Nation" (1922) by Judge Pound of the New York Court of Appeals, Columbia Law Review, vol. 22, p. 97; "The Scope and Nature of Concurrent Power" (1934) Columbia Law Review, vol. 34, p. 995, by Professor Grant; and "The Silence of Congress",

Harvard Law Review, vol. 41, p. 200, by Professor Biklé.

So far as the question of power of the state and national governments is concerned, the principles controlling are somewhat analogous whether affecting Indian affairs or interstate commerce. Broadly speaking, Indian affairs are a matter of national concern thought to admit of only one uniform system or principle of regulation. In the main the power of Congress to deal with such affairs is exclusive. This is subject to some qualifications hereafter to be noticed.

 Touching the question of power, principles discussed by the law writers may be summarized as follows:

(a) The power of Congress to regulate Indian affairs is granted exclusively to Congress so far as such affairs involve matters of national concern; (b) but the Constitution does not take away from the states their police power and legislation under that power may operate even. with respect to matters of national concern if it does not conflict with the will of Congress; (c) the silence of Congress in respect to a matter of national concern is generally interpreted by the court as evidence of its will that the matter shall not be regulated by the states; (d) but Congress may break this silence and permit state police laws to operate even where they involve matters of national concern; (e) in matters of local concern the power of Congress is not .exclusive; and (f) as to such matters the silence. of Congress

discloses no objection to the operation of state laws. To this summary might be appended another principle, namely, (g) when Congress acts affirmatively in any situation involving a matter of national concern, a state statute will be inoperative which (1) conflicts with some positive regulation of the federal legislation, or (2) is regarded by the court as intruding into the field which Congress meant to occupy by its legislation. A good illustration of the principle last mentioned is found in the compensation laws which have been held inoperative as to railroad employees engaged in interstate commerce even when they were injured under circumstances that created no right of action in their favor under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. Courts have interpreted this act of Congress as intended to provide a complete regulation of the liability of the interstate railroad to such of its employees as are engaged in interstate commerce. We mention this last subject principally because Congress in its protectorate of the Indian has enacted no law in the nature of a Death by Wrongful Act Statute for their protection and therefore has not attempted to cover the field.

The relations and status of Indians living on reservations as they may be affected by state and federal government have long been a matter of serious import. State and nation have asserted with vigor their protectorates of the Indians who themselves have urged their own suprem-

acy to regulate their own internal and social relations. Out of these conflicts between asserted sovereignties the idea that the Indians were foreign nations to be dealt with by state and nation through formal treaties has been modified and largely superseded by statutes enacted principally by the Congress.

It is to be noted that the case at bar does not involve the right of the Indians to regulate their own internal and social relations. It is not a controversy between Indians. The wrong sought to be redressed and the right sought to be vindicated did not arise out of any law of the tribe or any act of ·Congress for the protection of Indians. We assume that the tort alleged to have been committed on a public highway was not committed on an Indian reservation. No representative of the Nambe Indian Tribe is here asserting that the supremacy of their own sovereignty is being impinged. The plaintiff waives any such consideration in so far as it is within his power to waive it. The United States is not asserting an invasion of its sovereignty over the Indians. To the contrary, its high law officers are here asserting the operation of the state laws.

 We take notice that the view, entertained in the earlier days, that the Indians were a distinct and separate people, has been somewhat modified. · Earlier characterizations as being people of fiery tempers and as a people of nomadic habits and as being in a state of pupilage on account of natural infirmities and lack of mental training have also been modified. The Indians have, in varying degrees, adopted the arts and institutions of civilization. Farms and orchards abound and dwelling houses and barns are found that compare not unfavorably with those of neighboring communities. Churches and schools are maintained and modest accumulations of wealth are not unusual. Their speech, except among themselves, is largely English. Their blankets and feathered headgear are occasionally assumed for festive occasions but their general habits of dress are readily indulged by the dry goods store and ready-made clothing emporiums. They left the war path and buried the hatchet long ago and many of them have fought in the United States armies in its wars with foreign nations. They are no longer regarded as foreign nations. We are at peace with them. Taking notice of this progress, the Congress in 1924 bestowed upon Indians born in this country the status of citizens, Act June 2, 1924, 43 Stat. 253, 8 U.S.C.A. § 3. By way of analogy our argument does not require the assertion of the power of a state to convict reservation Indians in state courts of violations of state laws committed on Indian reservations although such assertion has been made not infrequently. It does not seem to be seriously contended that express consent of Congress is necessary to the assertion by state courts of jurisdiction over acts committed in violation of state laws by Indians when "off the reservation." Professor Grant, in his article cited supra, says:

"There are numerous instances in which the states, without express consent from Congress, have asserted jurisdiction over acts committed by Indians when off the reservation. E. g., People v. Antonio, 27 Cal. 404 (1865) (larceny); Hunt v. State, 4 Kan. 60 (1866) (murder); State v. Newell, 84 Me. 465, 24 A. 943 (1892) (illegal hunting); State v. Buckaroo Jack, 30 Nev. 325, 96 P. 497 (1908) (murder); State v. Big Sheep, 75 Mont. 219, 243 P. 1067 (1925) (illegal possession of wild plants).

"The writer has found no reported case in which such authority was denied. This seems sound. When Congress fails to act and the state is forbidden to do so, exclusive jurisdiction remains with the Indian tribe. Such a situation may be entirely satisfactory as to crimes committed by Indians on the reservation and yet be very unsatisfactory where such offenses are committed elsewhere. Nor would state action in this limited field constitute a serious challenge to the rights of the Indians. The right of the state to punish its own citizens for offenses against Indians would seem to be even clearer. See State v. Kenney, 83 Wash. 441, 145 P. 450 (1915)."

The view of the Washington Supreme Court in State v. Kenney, cited in the concluding sentence in the last foregoing quotation, is particularly applicable in the case at bar in view of the nature and objective of the Death by Wrongful Act Statute.

The foregoing observations conduct us to a consideration of the nature of the Death by Wrongful Act Statute, Comp.St. 1929, §§ 36-102, 36-104, and the effect of other statutory and constitutional provisions as applied to the case at bar.

It will furnish a good background and starting point to glance at the law relative to the jurisdiction of state courts to entertain a suit by an administrator of an unnaturalized alien resident of one of the states of the United States, owning no estate and who has no relatives in this country and who loses his life by the negligence of another, since an analogy has been urged and controverted in the argument here.

In Trotta's Adm'r v. Johnson, Briggs & Pitts, 121 Ky. 827, 90 S. W. 540, 541, 12 Ann.Cas. 222, Judge O'Rear wrote for the Court of Appeals a very able opinion which touches our problem in several particulars on the facts and the law, and we quote from it freely. It appears that Antonia Trotta, an unnaturalized Italian, was employed on work by defendants as a laborer. He lost his life by accident, which was charged by his administrator to have been by the negligence of his employer. An amended answer pleaded that Antonia Trotta was an *alien* and had *no estate at his death in that state,* and *no relatives residing there or in any of the states of the Union.* It was asserted that therefore the court had no jurisdiction to appoint appellant as his administrator and that consequently the appellant could not prosecute

the action. It will be noticed that the questions raised were similar to those in the case at bar and the decision is persuasive unless an Indian is in a position of greater disadvantage than an alien. The court said:

"In this country a man's life, as well as his body, are deemed to be his own. He has here an inherent natural right to live, and for the protection of his life, liberty, and property and the lawful pursuit of happiness all laws are made. They are not partial, in that they protect citizens alone. They apply to mankind within the jurisdiction of the state. An alien friend could not be lawfully deprived of his liberty in this state without cause, and, if falsely imprisoned, might maintain his action to recover the damages, not because our laws gave him the right to his personal liberty, but because they recognize that he already had the right. If his personal property was taken from him here without due process of law, our courts administering the laws of this state would restore it to him, albeit that in his own country he might not have the right to own such property or to maintain an action to recover it. This would not be allowed here under the idea that our laws created in him a right to the property, but that they recognized that right as an incident of manhood. The law of this state deems it best that all men should be secure in their lives, liberty, and property; not that some might be, and others have no redress. The state concerns itself with certain inalienable personal rights, declaring that they exist in all men, and recognizing them by the laws of this state as inhering to every person who is within this state, and to all citizens of the state wherever they may be.

"The Constitution and statute, allowing compensation for life lost through negligence of another, adopt a policy touching the most important subject of all government, in which it is recognized that human life should be protected as well from negligence as from crime. It is in the interest of society that it should be. Giving to the estate of the victim of the negligent act a right to recover compensation based upon the earning value of the life destroyed, or in addition punitive damages where the negligence is gross, is deemed an efficacious remedy for a recognized evil. It may be in certain instances in lieu of public punishment; but in any event its exaction will operate as a deterrent upon others, and thereby will tend to promote the safety of human beings. It could scarcely be said that a man has any greater right in his own life now than he had before the adoption of the constitutional provision and statutes of a kindred nature. His right originally was above all others, save where it is forfeited for crime. Nothing, therefore, could add to it. But these provisions give remedies through the courts that had not been previously administered. The application of the remedy by the courts is in pursuance of the public policy of the state to conserve human life within her jurisdiction. This policy is on a line with that which pro-

tects every person in his liberty and in his property, whether he be an alien or citizen, because it is best for the state that it should be so.

"Perhaps an alien may in his own government have no right to own property, or even to claim his own life against the ukase of his government. But when he is here his natural rights, those which all the states of the Union agree he has by nature, such as the right to live and to have his liberty, are recognized as belonging to him, not as created by the states at all; for no state can confer the right to live. We treat him as a human being, who, if wronged while within our jurisdiction in any personal or property right, may be redressed in our courts according to the laws of this state, giving such measure of compensation as we deem a proper equivalent for the wrong done. Whether the person's own government would have given any redress for the same injury if done to him there is wholly immaterial."

Judge O'Rear did not think it necessary to cite authority in support of propositions so plain, but the annotation accompanying the opinion collects a number of decisions said to be similar in effect and as supporting the reported case. From the note we also quote the following: "Tanas v. Municipal Gas Co., 88 App.Div. 251, 84 N.Y.S. 1053, was an action for the negligent killing of the plaintiff's intestate. It appeared that at the time of his death the deceased was a resident alien, being a subject of Turkey. His widow and next

of kin were nonresident aliens. The defendant raised several objections, among which were that the action could not be maintained because the fruits of the action would pass to nonresident aliens and that under the circumstances the administrator had no right to maintain the action. The court, after a review of several decisions upholding the right of an administrator to maintain an action of this nature, said: 'The deceased was a resident, although an alien, and entitled to the protection and benefit of both our common law and statutes. *There can be no question, if he had not died, that he would have had a right of action against the defendant,* and we think his representative can maintain the action prescribed by the statute, notwithstanding the ultimate fruits of the litigation shall pass to nonresident alien next of kin.' The court also held that a resident alien might act in the capacity of administrator." (Italics ours.)

▮▮▮ We have ourselves recently approved the view expressed by the Kentucky court that our Death by Wrongful Act Statute has to some degree an objective of public punishment and was designed in part at least to act as a deterrent to the negligent conduct of others and thereby promote the public safety and welfare. See Hogsett v. Hanna, 41 N.M. 22, 63 P.2d 540, 544, where we quoted with approval the language of the Circuit Court of Appeals of the Fifth circuit, Whitmer v. El Paso & Southwestern Co., 201 F. 193, relative to our Death by Wrongful Act Statute as follows: "The statutes allowing damages for wrongful act or neglect caus-

ing death have for their purpose more than compensation. It is intended by them, also, to promote safety of life and limb, by making negligence that causes death costly to the wrongdoer."

In article 2, section 4, of our Constitution, it is declared: *"All persons* are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness." (Italics ours.)

Our courts are dedicated to the administration of equal justice under law and we would be reluctant to hold that an Indian may not have the aid thereof for the protection of life, liberty, or property because the Congress has failed to consent that our beneficent state laws shall be applicable to him. And so far as it may be important to administer the Death by Wrongful Act Statute as a corrective measure to promote the public safety and welfare, we would be reluctant to hold that the state must lose the opportunity merely because the person negligently killed is an Indian.

It is readily conceivable that the negligent or wrongful act of one not an Indian against a reservation Indian on a public highway outside an Indian reservation whereby such Indian is killed may result in such negligent person being successfully prosecuted for manslaughter under our state statutes. We do not think this proposition would be controverted. Why, then, may not a similar objective be accomplished by resort to the

Death by Wrongful Act Statute upon similar facts?

As was said by the New York court in Tanas v. Municipal Gas Company, cited in the Ann.Cas. note supra, "There can be no question, if he had not died, that he would have had a right of action against the defendant." It is asserted in 14 R.C.L. "Indians" par. 15, that an Indian "may maintain an action in a state court to enforce his right to the enjoyment of property, real or personal, or for personal injuries, since the courts of a state are as a rule open to all persons irrespective of race, color or citizenship."

We do not understand counsel for appellee to controvert these principles as applied to an alien. They do not, of course, argue that an Indian is not entitled as a matter of natural right and justice to as much consideration at the hands of a state and its courts as an alien, but they say that the Indian is in a less fortunate position because he is the ward of the nation and the nation has been an indolent and indifferent guardian in that Congress has failed to expressly consent that the state law authorizing the appointment of administrators to enforce the provisions of the Death by Wrongful Act Statute or otherwise shall be applicable to Indians. Whatever may be the rights of the Indian when on the reservation, whatever may be the effect of the guardianship of the nation while he is there, we assert that when he is off the reservation and no Indian affairs are involved and Congress has not exercised its prerogatives, our state

law affords the Indian protection and may offer him rights which he may accept unless his guardian has said distinctly he shall not accept.

 It has been held that the power of Congress to legislate as to commerce among the states does not preclude the states from exercising police power and general jurisdiction for the security of lives, limbs, health and comfort of persons, and the protection of property even though interstate commerce might be incidentally affected. See Robbins v. Taxing Dist. of Shelby County, 120 U.S. 489, 7 S.Ct. 592, 30 L.Ed. 694.

Our Death by Wrongful Act Statute, section 36-102, Comp.St.1929, is for the protection of the lives and limbs of *all persons.* Indians are not expressly excluded and we are not impressed with the argument that they should be excluded by implication. As we have heretofore seen, our Death by Wrongful Act Statute embraces elements of local police regulation in the promotion of the safety of human beings within our borders. If this is so, it seems that the power to render effective such a state public policy is one that Congress does not need to consent to in express terms or otherwise but such state statutes will be operative unless Congress has expressly and affirmatively occupied the field so far as Indians are concerned.

If we assume, on the other hand, that torts committed against Indians outside of Indian reservations and redress therefor are matters which fall within the appropriate scope of legislation by Congress in the exercise of its protectorate over the Indians and Congress has not legislated and "the silence of Congress" is to be regarded as rendering inoperative the state statute invoked in the Indians' behalf unless Congress has consented to the operation of such statute, then the inquiry is whether such consent of Congress has been given.

We think the expression of Congress found in section 2 of article 21 of our Constitution, being a part of the "Compact with the United States" which was incorporated in compliance with the act of Congress to enable the people of New Mexico to form a constitutional state government is at least implied consent sufficient for the case at bar. A portion of said section is as follows: "The people inhabiting this state do agree and declare that they forever disclaim all right and title to * * * all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through the United States, or any prior sovereignty; and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States; * * * but nothing herein shall preclude this state from taxing as other lands and property are taxed, any lands and other property outside of an Indian reservation, owned or held by any Indian, save and except * * * as aforesaid, or as may be

granted or confirmed to any Indian or Indians under any act of Congress; but all such lands shall be exempt from taxation by this state so long and to such extent as the Congress of the United States has prescribed or may hereafter prescribe."

■ It is to be observed that this provision did not in any wise fetter or limit the Indian if a resident of this state so far as to deny to him any right political or otherwise enjoyed by any other resident of this state. The only restriction was as to his title to land acquired by him by virtue of the laws of the United States or any prior sovereignty and also restricting the power of the state to tax the land of the Indian so held and acquired or which might thereafter be granted or confirmed to any Indian or Indians under an act of Congress. With these exceptions there is reserved to the state the power to tax the lands and other property of Indians. This reservation of power in the state implies the consent of Congress to acquisition by reservation Indians of land and property outside of an Indian reservation and outside of lands and property granted to him by Congress, which outside property will become subject to taxation. It is manifest that it would be idle for Congress to stipulate that the state could tax certain lands and property of Indians if the Indians are powerless to acquire such lands and property. The power to tax property carries with it the power of the state to dispose thereof to enforce the payment of delinquent taxes. The courts will be open to the Indian tax-payer to make any defenses which are open to other taxpayers similarly situated. Such defenses would doubtless be open to the personal representative of a deceased taxpayer. The state could doubtless enforce its claim for taxes against a deceased Indian's estate composed of property not in the field of restricted or qualified ownership. Suit to quiet title to land of Indian delinquent taxpayers acquired at tax sales would not likely be defeated because the Indian taxpayer was dead. His heirs and the administrator of his estate could doubtless, in appropriate circumstances, be made parties to such a suit. It would seem, therefore, that the cause of action which an Indian acquires when a tort is committed against him is property which he may acquire or become invested with, particularly if the tort is committed outside of an Indian reservation by one of our citizens who is not an Indian, and where such Indian is killed as a result of such tort the cause of action survives.

The article "Nationals without a Nation" (1922), cited supra, which reviews some of the difficulties arising from conflicts of laws, commences as follows: "The relations and status of the Indians living on the reservations of New York State as they may be affected by the State of New York and the United States Government have become a matter of serious import. A state commission has been created to confer with committees of Congress in relation to Indian affairs. The time calls for action as well as discussion."

It seems not unlikely that the act of Congress of 1924, title 8, § 3, U.S.C.A. conferring citizenship upon the Indians was in response to this call for action.

While, as we have pointed out, an alien is entitled to the protection of our laws and may generally resort to our courts for the redress of his wrongs, it must be conceded that our own citizens are generally supposed to enjoy more abundant privileges. We cannot help thinking that the conferring of citizenship upon the Indian improved his status politically and economically, even though he has not been fully emancipated.

The Supreme Court of Appeals of Virginia in Low Moor Iron Co. v. La Bianca's Adm'r, 106 Va. 83, 55 S.E. 532, 9 Ann. Cas. 1177, decided: "Under Va. Code 1904, § 2902 et seq., authorizing the maintenance of an action for the death of a person caused by the wrongful act of another, and providing that the action shall be brought in the name of the personal representative of the decedent, and that the amount recovered shall be paid to the personal representative and distributed by him to the wife, husband, and child of the decedent, an administrator of a decedent who was a resident alien, and whose widow and infant child are nonresident aliens, may bring such an action."

The court quoted the late Oliver Wendall Holmes as follows: " 'It is true that legislative power is territorial,' said Holmes, C. J., in Mulhall v. Fallon [176 Mass. 266, 57 N.E. 386, 54 L.R.A. 934, 79 Am.St.Rep. 309] supra, 'and that no duties can be imposed by statute upon persons who are within the limits of another state. But rights can be offered to such persons, and if, as is usually the case, the power that governs them makes no objection, there is nothing to hinder their accepting what is offered.' "

The argument is appropriate here. The fact that state power may not extend to Indian reservations and to Indian affairs does not preclude the state from offering rights to reservation Indians and the power that governs the Indians is making no objection here to the Indians accepting what our statutes have offered to *all persons* alike. The Special Assistant to the Attorney General, pursuant to request of the Secretary of the Interior and by the direction of the Attorney General of the United States, appears here to assert that the state statutes are operative. While it must be conceded this is not tantamount to consent by Congress, these interpositions of high law officers of the United States charged with a duty of upholding the interests of the United States involve a construction of the Constitution and laws of the United States and are persuasive that the protectorate of the federal government over the Indians is not being impinged upon.

In Lineback v. Howerton, 181 Ark. 433, 26 S.W.2d 74, 76, the Supreme Court of Arkansas, considering the jurisdiction of a probate court of Arkansas to appoint an administrator on the estate of a Cherokee Indian residing in Oklahoma, having property in Arkansas, said: "We are unable to

discover anything in the acts of Congress referred to and quoted by the appellee regarding the jurisdiction of Indians and their property that would preclude the courts of this state from dealing with property of an Indian, whether alive or dead, which is situated within the borders of this state. At most, these statutes were intended to apply to the personal and property rights of Indians in the Indian Territory, now a part of the state of Oklahoma, reserving to the government of the United States the right to preserve by law the property and other rights of the Indians acquired by treaty or otherwise, and could not have, and were not intended to have, any extraterritorial effect."

And in the case at bar we are unable to discover in the acts of Congress which have for their object the regulation of Indians' affairs and exercising a control of Indian reservations and the property granted by Congress to Indians anything which militates against the power of the state to confer a right upon an Indian arising from our Death by Wrongful Act Statute.

The judgment overruling the demurrer and dismissing plaintiff's complaint is reversed, and the cause remanded, with directions to sustain the demurrer to defendant's further, separate and affirmative answer, and for further proceedings not inconsistent herewith.

It is so ordered.

HUDSPETH, C. J., and SADLER, BRICE, and ZINN, JJ., concur.