## UNITED STATES v. LEATHERBERRY.

*(District Court, S. D. Mississippi. May 26, 1886.)*

---

## *In re* WOLF and another.

*(District Court, W. D. Arkansas. May Term, 1886.)*

1. CRIMINAL LAW—WARRANT FOR REMOVAL—TRIAL, WHERE HAD.
The judge of a United States court, when acting on an application for a war-
rant for the removal of a person charged with crime, from one district to an-
other for trial, is to exercise a sound judicial discretion. He must look to the
question of the jurisdiction of the court sitting where he is asked to remove
the prisoner, to try the case. To determine where the trial is to be had, he
may look into the whole case to see that the court where the party is to be
removed has jurisdiction over the place, the person, and the subject-matter.

2. SAME—WANT OF JURISDICTION.
There may be a want of subject-matter, either because there is no law mak-
ing the act charged a crime, or because the act is not properly charged, or
that the party charged has not done the act.

3. SAME—INDICTMENT.
If the indictment contains allegations sufficient to show a crime has been
committed by the party charged, it is the practice of the federal judges to

take the same as a *prima facie* showing that a crime has been committed by the party charged, at the place alleged, and, if nothing else appears, to order a removal of the party charged.

**4. SAME—CONSTRUCTION OF STATUTES IN RESTRAINT OF LIBERTY.**
This is a law in restraint of liberty, and, like all laws of this character, while the very substance of the law is not to be construed away, yet it is to be strictly construed and strictly pursued.

**5. COURTS—SUPREME COURT OF DISTRICT OF COLUMBIA.**
The supreme court of the District of Columbia has jurisdiction of an offense committed by one Indian upon another Indian.

**6. INDIANS—CRIMES—JURISDICTION.**
The prohibition against the jurisdiction of the courts of the United States to try an Indian for an offense committed on another Indian applies only when the offense is committed in the Indian country. When the Indian commits a crime outside the Indian country, (although that crime may be on another Indian,) he is, like any other person, amenable to the criminal laws of the place where the crime is committed.

**7. CONSPIRACY—REV. ST. § 5440.**
Conspiracy, as defined by section 5440, Rev. St., means an unlawful agreement to do some act which by some law of the United States has been made a crime. This is what is meant by agreeing to commit an offense against the United States.

**8. SAME—OFFENSE IN DISTRICT OF COLUMBIA.**
The laws of Maryland in force on the twenty-seventh of February, 1801, are laws applicable to the District of Columbia in all cases where they have not been changed by act of congress, or in all cases where an act of congress does not apply to the subject-matter.

**9. FALSE PRETENSES—CRIME IN DISTRICT OF COLUMBIA.**
False pretenses is a crime in the District of Columbia, both by the law of Maryland applicable to the District, and by an express statute of the District.

**10. CONSPIRACY—OFFENSE AGAINST LAWS OF UNITED STATES.**
Any conspiracy to obtain money by false pretenses in the District of Columbia is a conspiracy to commit an offense against the United States.

The petitioners in this case were, on April 9, 1886, at a term of the supreme court for the District of Columbia, indicted, together with William A. Phillips, for violation of section 2105 of the Revised Statutes; that is, for making a contract with Indians in violation of the law of the United States. Subsequently, on April 21, 1886, they, together with William A. Phillips, were indicted in said court for a conspiracy to commit an offense against the United States. Upon the first-named indictment a warrant was issued by Stephen Wheeler, a commissioner of the United States district and circuit court for the Western district of Arkansas, for the arrest of Wolf and Ross, who were in said district, that, as provided by section 1014 of the Revised Statutes, they might, by the order of the judge of said court, be removed to the place of the sitting of the supreme court of the District of Columbia for trial. They were arrested on the warrant of the commissioner, and, while in the custody of the marshal of the United States for the district, they presented to the judge of the court a petition for a writ of *habeas corpus*, praying for a discharge from arrest because they are citizens of the Cherokee Nation; members of said tribe or nation of Indians by blood; and that in and about the things

and matters set up in the indictment to have been done by them they were officers of the Cherokee Nation, and in and about said matters they were acting in their official capacity under the laws of the Cherokee Nation, and represented her in and about the transaction alleged against them in the indictment; that they are amenable only to the courts and laws of the Cherokee Nation; that the supreme court of the District of Columbia, in which said indictment was found, and to which it is sought to remove them, has no jurisdiction to try them for the alleged offense; that the aforesaid indictment charges no offense; that it is void for uncertainty, and otherwise insufficient to give the aforesaid court of the District of Columbia jurisdiction over the persons of the petitioners; that the said court has no jurisdiction of the subject-matter, or of the persons of the petitioners. Wherefore they say they are unlawfully held and restrained of their liberty by the marshal, contrary to the constitution and laws of the United States. They pray they may be discharged. The government, by its attorney, moved for a warrant of removal of Wolf and Ross to the District of Columbia, that they might be tried on the indictment. Subsequently the indictment for conspiracy was presented to the court.

*William H. H. Clayton*, for petitioners.

*E. C. Boudinot*, for the United States.

PARKER, J. The question in this proceeding is, should these parties, Wolf and Ross, be removed to the District of Columbia for trial on either one of these indictments? If, under the law, they should, they are not entitled to be discharged on *habeas corpus*. If they should not be so removed, they are entitled to a discharge, either by *habeas corpus* or without it.

Under the law of the United States, (section 1014, Rev. St.,) "where any offender is committed in any district other than that where the offense is to be tried, it shall be the duty of the judge of the district where such offender is imprisoned seasonably to issue, and of the marshal to execute, a warrant for his removal to the district where the trial is to be had."

This court held in the case of *U. S.* v. *Rogers*, 23 Fed. Rep. 658, that the judge, in acting on an application for the removal of a party charged with crime, was performing a judicial function; and in the performance of such function he may look into the proceedings of the commissioner, or the court in which the indictment was found, for the purpose of enabling him to properly determine questions pertaining to the removal, and grant or refuse the order accordingly. Under the section of the statute above referred to the judge is invested with plenary power to grant or refuse the warrant of removal, and he is but exercising sound judicial discretion when he looks into the question of jurisdiction, or into the whole case, so far as to enable him to determine where the trial is to be had. If the indictment contains

allegations sufficient to show a crime has been committed by the party charged, it is the practice of the federal judges to take the same as a *prima facie* showing that a crime has been committed at the place alleged by the party charged; and, if nothing else appears, to order a removal of the party charged. But I have no doubt the judge, in his sound discretion, may go into the whole case, if necessary, to enable him to determine whether the party is to be removed from his home to a distant part of the country. This is a law in restraint of liberty, and, like all laws of this character, while the very substance of the law is not to be construed away, yet it is to be strictly construed, and strictly pursued. The government asking a removal is required to fully comply with the law.

The question, then, which presents itself to the judge is, where the case is to be tried, where a trial can be had. Before a trial can be had before any court of the United States, such court must have jurisdiction over the place, the person, and the subject-matter. If there is an absence of subject-matter, the trial cannot be had. There may be an absence of subject-matter, either because there is no law declaring the act charged a crime; or because, as charged, the act is not a crime; or because the facts fail to show that the party sought to be removed committed the act charged. I shall confine myself to the indictment charging a conspiracy, because if this shows a crime committed by persons over which, and at a place where, the supreme court of the District of Columbia has jurisdiction, it would be my duty to order a removal of the petitioners to that court for trial.

The indictment in this case alleges this crime was committed in the District of Columbia. There is no question of the jurisdiction of the court in which the indictment was found extending over the place where the crime is alleged to have been committed.

Then, the next question is, does the supreme court of the District of Columbia have jurisdiction over the persons of petitioners? The petitioners, Wolf and Ross, are shown to be Indians by blood, members of the Cherokee Nation or tribe of Indians because of their having the blood of the race. They reside in and are a part of the Cherokee Nation or tribe of Indians. This crime is one alleged to have been committed against the Cherokee Nation of Indians, which in law is an Indian tribe. This, then, is a case of a crime committed by one Indian against another Indian. It is claimed, this being true, the case is not within the jurisdiction of the supreme court of the District of Columbia; that said court has no jurisdiction over the persons of defendants. Section 2145, Rev. St., provides that, "except as to crimes the punishment of which is expressly provided for in this title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country." Section 2146, among other things, provides that the preceding section shall not be construed to

extend. to crimes committed by one Indian against the person or property of another Indian. * * *"

The prohibition by this section of the law of the jurisdiction of a court of the United States over a crime committed by one Indian upon another is one which is personal to the Indian, only when the crime is committed in a certain section of the country, to-wit, the Indian country. It is a prohibition which is clearly local. When a crime is committed by an Indian, although such crime may be against the person or property of another Indian, if committed outside the Indian country, the Indian is like any other person as far as the criminal laws of the nation or the states are concerned. In a case where he has committed a crime against such laws, he is by them a forensic citizen, subject to the jurisdiction of the courts which administer them. Our laws govern all. They bind and protect all. They bind and protect alike all persons,—natives, foreigners, and those whose *status* to the United States may be one of alienage. They are all alike subject to the criminal laws of the country, and when they commit a crime against the laws of the nation, at a place over which the courts of the nation have jurisdiction, they are subject to trial in such courts. Mr. Kent, in 1 Kent, Comm. 36, says: "Strangers are equally bound with natives to obedience to the laws of the country during the time they sojourn in it, and they are equally amenable for infractions of the law."

To the above rule there are some exceptions: *First*, the case of a foreign sovereign and his attendants; *second*, foreign embassadors, and their attendants. By the law of nations they are not subject to the laws of a country they may visit, or in which they may have a temporary domicile. Sections 124–134, Bish. Crim. Law.

The other exception is one recognized as existing under the laws of the United States. It is that of an Indian committing a crime upon another Indian, *in the Indian country.* When an Indian is outside of that country he is entitled to the full measure of protection afforded by the laws of the nation, and if he commits a crime outside of the Indian country, whether upon one of his own race or another, he is amenable to the law of the place where the crime is committed. This proposition, to my mind, is established when stated.

This, then, disposes of the proposition as to the jurisdiction of the court in which the indictment was found over the persons of petitioners.

The next question is, did said court have jurisdiction over the subject-matter? This involves the query as to whether there is any subject-matter; that is, whether the act charged to have been done by them is made a crime by the laws of the United States; then, whether such crime is properly charged. The crime charged to have been committed by the petitioners is conspiracy to commit a crime against the United States, which, by section 5440, Rev. St., is defined to be a crime. By the common law a conspiracy is an agreement be-

tween two or more persons to do some unlawful act, or to do a lawful act in an unlawful manner. The agreement itself constitutes the offense, whether an act is done in furtherance of the object or not.

Section 5440, Rev. St., is as follows:

"If two or more persons conspire, either to commit any offense against the United States, or to defraud the United States in any manner, or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty. * * *"

It is manifest that to constitute a criminal offense under this section the object of the conspiracy must be to commit some offense against the United States; that is, to do some act made a crime by the laws of the United States, or to defraud the United States; and that something must be done by one or more of the conspirators to effect the object of the conspiracy. The definition of this offense would be "an agreement between two or more persons to do some act which, by the laws of the United States, is a crime, and the doing of some act, by one or more of those who had so agreed, in furtherance of or to effect the object of the agreement." To constitute a good indictment under this section, it must charge that the conspiracy was to do some act made a crime by the laws of the United States, and it must state with such reasonable certainty the acts intended to be effected or carried out by the agreement of the parties so that it can be seen the object of the conspiracy was a crime against the United States. The conspiracy or agreement, and the doing of some act in furtherance of it, make up the offense. The object of it, however, is a requisite of the indictment.

To my mind, this indictment charges an agreement between Ross, Wolf, and Phillips, and other parties unknown, to obtain from the Cherokee Nation, by false pretenses, the sum of $22,500. It charges the unlawful agreement to cheat and defraud the Cherokee Nation of the sum of $22,500. It charges the means to be used by them in cheating and defrauding the Cherokee Nation. It charges they did an act in furtherance of the unlawful agreement, or to effect the object of the conspiracy, to-wit, the said Wolf and Ross received from Dennis W. Bushyhead, who was then chief of the Cherokee Nation, a large sum of money, to-wit, the sum of $22,387.50 in lawful money of the United States. The means set out in the indictment as being the method adopted by the unlawful agreement to consummate it, show the purpose to have been to commit the crime of obtaining money by false pretenses. Now, is this a crime against the United States, when committed in the District of Columbia?

Congress has power, by virtue of article 1, § 8, of the constitution, to exercise exclusive legislation over the District of Columbia. Congress, by the act of the twenty-first of February, 1871, which is now embodied in section 93 of the Revised Statutes for the District of Columbia, has provided that "all laws of the United States which are

not locally inapplicable shall have the same force and effect within the District as elsewhere in the United States." This statute makes section 5440, relating to the crime of conspiracy, applicable to the District of Columbia. Now, a conspiracy to do any act which has been declared a crime by any law of the United States, although such law may be applicable to the District of Columbia alone, would be a conspiracy to commit an offense against the United States, as violations of the criminal laws relating to the District of Columbia are offenses against the United States. Such laws are as much laws of the United States as though their application was to the whole country. A conspiracy to commit any act which by any law of the United States is a crime is a conspiracy to commit an offense against the United States.

Is there any law in the District of Columbia which makes it an offense to obtain money by false pretenses? By the act of congress of February 27, 1801, "the laws of the state of Maryland, as they now exist, shall be and continue in force in that part of the said district which was ceded by that state to the United States, and by them accepted." Section 92, Rev. St., relating to the District of Columbia, provides "that the laws of the state of Maryland not inconsistent with this title, as the same existed on the twenty-seventh of February, 1801, except as since modified or repealed by congress, or by authority thereof, or until so modified or repealed, continue in force within the District." These provisions of law carry the laws of Maryland as they existed February 27, 1801, to the District of Columbia, and make them as applicable to such District as though such laws had been expressly enacted by congress. What is now called the crime of "false pretenses" was not indictable at common law, unless the false pretense consisted of a false token which would impose on the public generally,—such as getting property by means of a worthless bank-bill, or cheating by means of false weights or measures, such as the gallon, the yard, or a false seal affixed to cloth in order to enhance the price. The cheating which was indictable at common law as a false pretense was one effected by some illegal and deceitful practice or token which affects, or may affect, the public. The English statute of 30 Geo. II. c. 24, passed in 1757, was the first time the English law took notice of these private frauds known by the name of "false pretenses." This statute provided "that all persons who knowingly and designedly, by false pretense or pretenses, shall obtain from any person or persons, money, goods, wares, or merchandise, with intent to cheat or defraud any person or persons of the same, shall be deemed offenders. * * *" This statute was held to have created an offense which did not exist before. It was considered by the English courts to extend to every case where a party had obtained money or property by falsely representing himself to be in a situation in which he was not, or any occurrence which has not happened, to which persons of ordinary caution

might give credit. This English statute of Geo. II., by the constitution of Maryland, adopted in the year 1776, was carried to the state of Maryland, and made as much a part of the law as though her assembly had expressly enacted it; as by such constitution "all English statutes then in force in England or Great Britain, which have been introduced, used and practiced by the courts of law or equity" of Maryland, were adopted as the law of Maryland. 1 Charters & Const. 829. This statute of Geo. II. was in force in 1776. It was introduced, used, and practiced in the state of Maryland. It was the law of Maryland on the subject of false pretenses on the twenty-seventh of February, 1801. By the act of congress of that date it was carried to the District of Columbia. For these reasons, I think it clear that getting money by false pretenses, when the act is done in the District of Columbia, is an offense against the United States. But it is hardly necessary to go to the law of Maryland to ascertain whether false pretenses is a crime, when the law of the United States, as applicable to the District of Columbia, in section 1162, Rev. St., relating to the District, provides that every person convicted of obtaining by false pretenses any goods or chattels, money, bank-note, promissory note, or any other instrument in writing, for the payment of money or other valuable thing, etc., "shall be punished," etc. There may be some question as to where we are to look for a definition of the crime prescribed by this act. But there can be no question as to where we can find a definition of the crime under the English statute, carried to the District of Columbia by a rather circuitous, yet effective, process. We find it in the interpretation of the same by the English courts.

To constitute the offense of false pretenses it must appear (1) that there was an intent to defraud; (2) that an actual fraud was committed; (3) that the false pretense was made for the purpose of perpetrating the fraud; (4) that it was accomplished by these means. This is the crime against the United States which the petitioners are charged with conspiring to commit. While they are not charged with committing this crime, but only conspiring to commit it, the indictment must set out enough to enable us to see that the act they have conspired to commit is a crime against the United States. I think the indictment does this. It sets out the fraudulent agreement; the fraudulent design; the false and fraudulent means which were to be resorted to that the fraudulent end might be accomplished; and the doing of an overt act in furtherance of the unlawful design.

The indictment, in my judgment, under the law, is sufficient to show jurisdiction of place and person, the existence of, and jurisdiction over, the subject-matter by the supreme court of the District of Columbia. It is claimed in argument that the allegation of falsity, as set out in the indictment in regard to the statements made by Ross, Wolf, and Phillips to the Cherokee Nation,—that the appropriation of

$300,000 to said nation, by the act of congress, of the third of March, 1883, was made as an additional payment to it for lands which it had already sold to the Pawnees, Poncas, Nez Perces, Otoes, and Missouries, and Osages,—is not true; as a matter of fact, such appropriation was made as an additional payment upon lands so sold, and if such representations were made by Ross, Wolf, and Phillips, instead of their being false, they were true. Whether these representations, if made, were true or false, is hardly material, as there are several other means set out in the indictment by which the conspiracy was to be accomplished, any one of which would be sufficient to indicate the method of consummating the purpose of the conspiracy, all of which means are alleged to be false and fraudulent. I am of the opinion that the position of petitioners' counsel on this question is correct. The Cherokee Nation agreed with the United States, by the sixteenth article of the treaty of 1866, that the United States might settle friendly Indians on its lands west of ninety-sixth degree. It further agreed that it would sell to such friendly Indians as the United States might settle on their lands such amount of land as was necessary to give each member of said tribe so settled 160 acres; said lands thus disposed of to be paid for to the Cherokee Nation at such price as may be agreed on between the said parties in interest, subject to the approval of the president; and if they should not agree, then the price to be fixed by the president; the Cherokee Nation to retain the right of possession of, and jurisdiction over, all of said country west of ninety-sixth degree of longitude until thus sold and occupied, after which their jurisdiction and right of possession to terminate forever. This provision of the treaty is clearly an agreement to sell to friendly Indians, who the Cherokees agree with the United States may be settled on the land. The Cherokees have sold portions of their land to the Pawnees, Poncas, Nez Perces, Otoes, and Missouries, and Osages. An agreement was entered into to sell to the Cheyennes and Arrapahoes which was never consummated, as they never went on the land and occupied the same. They have no just claim to it, and it still belongs to the Cherokees. The Cherokees have never parted with any other of their lands west of the ninety-sixth degree.

It could hardly be presumed that the government was paying for lands in advance of a sale, or even an agreement to sell. The Cherokees agreed to sell to friendly Indians, the same to be their property only when sold to them and occupied by them. But it is said that all the lands of the Cherokees west of ninety-sixth degree, not sold to friendly Indians, were appraised by the president under the act of congress of May 29, 1872. It is true that section 5 of that act provided:

The "president and secretary of the interior are hereby authorized to make an appraisement of the Cherokee lands lying west of the ninety-sixth degree of west longitude, and west of the lands of the Osage Indians, in the Indian

territory, and south of the southern line of the state of Kansas, *ceded* to the United States by the Cherokee Indians under their treaty of July 19, 1866, for the settlement of friendly Indians, and report the same to congress."

Now, they by the treaty of 1866, ceded no lands to the United States west of the ninety-sixth degree. They only consented the United States might settle friendly Indians on the land west of the ninety-sixth degree, and agreed to cede, not to the United States, but to the friendly Indians when they went on the land. Under this law the president had no right to appraise any land except what had been sold to the friendly Indians by the Cherokees. The appraisement by him of any other lands took away no rights from the Cherokees, and gave none to the United States. From the proof before me, the Cherokees never understood this payment to them of $300,000 to be a payment on their unsold and unoccupied lands; but they always claimed the price proposed to be paid to them for the occupied lands was inadequate,—less than in justice and equity they were worth; and through their agents, from the time of the sale of the same, they were pressing their claim for the payment of their true value.

The executive department of the government did not understand this $300,000 payment to be a payment on other than the lands already sold and occupied, as evidenced by the letter of the Hon. H. M. Teller, secretary of the interior, of January 31, 1883, in which he says:

"In my opinion the appropriation of $300,000 proposed by the amendment is not an unreasonable one, as the sums already paid to the Cherokee Nation, with this proposed appropriation added, are not believed to be in excess of the value of the land upon which friendly Indians have already been located."

This court held in *U. S.* v. *Rogers*, 23 Fed. Rep. 659, that the Cherokee Indians hold what is called the "Cherokee Outlet" by substantially the same kind of title it holds its other lands. The title to all its lands was obtained by grant from the United States. This title is a base, qualified, or determinable fee, without the right of reversion, but only the possibility of reversion in the United States. This, in effect, puts all the estate in the Cherokee Nation. *U. S.* v. *Reese*, 5 Dill. 405. This principle puts the title fully and completely in the Cherokee Nation, and, until it agrees to part with the same, it cannot be taken from it. It has not yet agreed to part with these lands except for a specific purpose. It does seem to me there need be but little trouble on the question of the title of the Cherokees to their lands, if we but look at this title, and understand its true nature, and are prompted by a sense of duty to do equal and exact justice to the Indians, and to give them that full measure of justice which by law and good conscience belongs to them.

These petitioners will be required to give bond in the sum of $2,000 for their appearance before the supreme court of the District of Columbia for trial, or, in case of failure to give such bond, the warrant of removal will be issued to be executed by the marshal.