ALLIE PONINA, ALSO KNOWN AS ALLIE PAULINA, APPELLANT, v. ROBERT LELAND, ADMINISTRATOR OF THE ESTATE OF PAUL PONINA, ALSO KNOWN AS PAUL PAULINA, DECEASED; NEMSINA DeGARMO, FRANK JOHN, AND MAMIE GIBBS, HEIRS, RESPONDENTS.

No. 5660

April 30, 1969

454 P.2d 16

*Bouvier and Harper,* of Reno, for Appellant.

*Lohse and Lohse,* for Respondent Robert Leland, Administrator; *Leslie B. Gray,* for Respondent DeGarmo; *Bradley & Drendel,* for Respondent Frank John, all of Reno; *William N. Dunseath,* of Reno, and *McKay, Panner, Johnson & Marceau,* of Bend, Oregon, for Estate of Mamie Gibbs.

## OPINION

By the Court, COLLINS, C. J.:

This appeal is from an order determining heirship and a holding that Allie Ponina was not the wife and hence not the widow of Paul Ponina, deceased. We reverse that ruling and declare that Allie and Paul were husband and wife at the time of his death. She is therefore entitled to share in his estate as his widow.

Allie Ponina is an aged (71 years) full-blooded Paiute Indian and a member of the Pyramid Lake-Nixon Tribe. She was formerly married to a man named Lowery who died in 1950 or 1951.

Paul Ponina was also an aged full-blooded Paiute Indian but a member of the Klamath Tribe in Southern Oregon. He also had been married to an Indian lady by the name of Mabel, but when she threw his clothes and blanket outside their house, not liking that treatment he left her permanently.

Sometime in 1951 Allie and Paul commenced living together at the reservation in Nixon, Nevada. Shortly thereafter they moved off the reservation and continued living together in Smith Valley, Nevada, which is not a part of any Indian reservation. In 1954 Paul obtained a formal decree of divorce from Mabel in the First Judicial District Court of Nevada. Thereafter, Paul and Allie continued to live together in Smith Valley until his death in 1960.

During all this time, Allie and Paul openly cohabited and held themselves out to be husband and wife. They were known among their Indian friends and family at the Reno Indian Colony and Pyramid Lake reservation and their neighbors in Smith Valley as husband and wife. They executed a mutual, inter vivos trust agreement in that capacity. At Paul's death, Allie, in accordance with Indian custom, provided the burial clothes and bought and cooked the burial feast.

During their life together, however, they neither sought any license to marry from a state or Indian agency, engaged in any solemnization ceremony before a minister, state or Indian judge, nor recorded any certificate or evidence of their marriage with either a state or Indian agency.

They did, however, comply with all the requirements of a Paiute Indian custom marriage as established by witnesses at the trial and by the stipulation as to the expected testimony of Dr. Warren L. D'Azevedo, head of the Anthropology Department, University of Nevada. Those elements are: (1) living together as man and wife; (2) a potentially mating couple, i.e., no close blood relationship; (3) a division of labor and responsibility; (4) recognition by each other as being husband and wife; (5) recognition by the community as being a married couple; (6) no form of ceremony required.

Paul left a substantial estate, consisting mainly of an undivided interest in the Klamath Indian Management Trust, valued at $42,413.34. During administration of his affairs, the status of Allie as his wife and widow arose. It was contended that Paul and Allie never became husband and wife under federal law, state law, tribal law or Indian custom, though they lived together for nearly 10 years. Accordingly, the lower court declared her not to be his widow and heir, and the right of inheritance to his property was decreed to three first cousins, Nemsini DeGarmo, Frank John and Mamie Gibbs.

Appellant in seeking reversal of the decree as to Allie, contends that under state law, NRS 122.170[1], Allie and Paul achieved a valid Indian marriage, notwithstanding their failure to secure a signed certificate specified by subsection 2 and their

[1]"122.170 **Marriages between Indians consummated in accordance with tribal customs valid: Certificates of marriage; contents; recording.**
1. Marriages between Indians heretofore or hereafter consummated in accordance with tribal custom *shall be of the same validity as marriages performed in any other manner provided for by the laws of the State of Nevada.*
2. A certificate of any such marriage may be signed by:
(a) An official of the tribe of which at least one of the parties is a member; or
(b) An official of the reservation or colony in or upon which at least one of the parties shall at the time reside; or
(c) The superintendent of an Indian agency legally established in this state by the United States.
3. The certificate *may be* filed in the office of the recorder of the county where such marriage shall have taken place, and within 30 days thereafter, and such certificate or certified copy thereof shall be prima facie evidence of the facts therein recited.
4. The certificate shall give the names of the parties married, their ages, tribe, and the place and date of the marriage, and shall show the official status of the person signing the same.
5. Any certificate, affidavit or other type of proof recognized by the United States, or any department thereof as proof of a valid tribal marriage, regardless of when or where the tribal marriage shall have been entered into shall be proof of the validity of such tribal marriage in the State of Nevada."

failure to file the certificate of marriage provided for by subsection 3 of that statute.

Respondents, on the other hand, contend the lower court was correct in ruling as it did under any one of several authorities, including federal, tribal, and state law.

Specifically, they say Allie and Paul were not married under federal law. Pursuant to the authority granted by 25 U.S.C., Sec. 2, certain federal regulations relevant to this issue were enacted.[2]

---

[2]25 CFR "Part 11—LAW AND ORDER ON INDIAN RESERVATIONS.          . . . . .

"§ 11.1   **Application of the regulations.**

(a) The regulations in this part relative to Courts of Indian Offenses shall apply to all Indian reservations on which such courts are maintained.          . . . . .

(d) The regulations in this part shall continue to apply to tribes organized under the act of June 18, 1934 (48 Stat. 984; 25 U.S.C. 461–479), *until a law and order code has been adopted* by the tribe in accordance with its constitution and bylaws and has become effective; . . . .

(e) Nothing in this section shall prevent the adoption by the tribal council of ordinances applicable to the individual tribe, and after such ordinances have been approved by the Secretary of the Interior they shall be controlling, and the regulations of this part which may be inconsistent therewith shall no longer be applicable to that tribe. (Emphasis added.)          . . . . .

"§ 11.27   **Recording of marriages and divorces.**

All Indian marriages and divorces, whether consummated in accordance with the State law or in accordance with tribal custom, shall be recorded within 3 months at the agency of the jurisdiction in which either or both of the parties reside.

"§ 11.28   **Tribal custom marriage and divorce.**

(a) The Tribal council shall have authority to determine whether Indian custom marriage and Indian custom divorce for members of the tribe shall be recognized in the future as lawful marriage and divorce *upon the reservation,* and if it shall be so recognized, to determine what shall constitute such marriage and divorce and whether action by the Court of Indian Offenses shall be required. When so determined in writing, one copy shall be filed with the Court of Indian Offenses, one copy with the superintendent in charge of the reservation, and one copy with the Commissioner of Indian Affairs. Thereafter, Indians who desire to become married or divorced by the custom of the tribe shall conform to the custom of the tribe as determined. Indians who assume or claim a divorce by Indian custom shall not be entitled to remarry until they have complied with the determined custom of their tribe nor until they have recorded such divorce at the agency office.

(b) Pending any determination by the tribal council on these matters, the validity of Indian custom marriage and divorce shall continue to be recognized as heretofore."

However, these regulations apply to law and order, marriage and divorce on a reservation only. See the title of Part 11 of CFR—Law Order on Indian Reservations; see also 25 CFR 11.1(a) and 11.28(a). Also, these regulations apply only "until a law and order code has been adopted by a tribe." 25 CFR 11.1(d). Since the Pyramid Lake Paiute Tribe has adopted its own law and order code, we must look to that code and not the federal regulations in an inquiry into the marital status of Paul and Allie while living at Nixon, a part of that reservation.

Respondents next contend the law and order code of the Pyramid Lake Paiute Council enacted March 25, 1941, pursuant to the foregoing federal regulations are controlling in determining the marriage status of Paul and Allie. Only certain portions of that code are relevant to the issue presented here.[3]

By this code, tribal custom marriages were abolished and, even though there was evidence that custom marriages and divorces were still being practiced on the reservation on a large scale, still the marriage of Paul and Allie could not have come into effect during the short period of time they lived together

---

[3]"Chapter 3. DOMESTIC RELATIONS. Sec. 1. RECOGNITION OF PREVIOUS MARRIAGES.

All Indian marriages hereto consummated, whether according to State or Tribal custom, are declared valid subject to annulment as provided in Chapter 3, Section 7 of these ordinances. All such marriages previously consummated according to Tribal Custom shall be recorded with the Indian Court within 60 days after the adoption of these ordinances by the Tribal Council. All marriages consummated after the adoption of these ordinances shall be recorded at the Indian Agency office within three months."
"Sec. 3. MARRIAGE AND DIVORCE.

The Pyramid Lake Tribal Court shall have jurisdiction over the marriages and divorces of the members of the Pyramid Lake Reservation, as hereinafter defined. *Indian custom marriages and divorce shall not be recognized hereafter.* (Emphasis added.)
"Sec. 4. MARRIAGE.

Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. *Consent alone will not constitute marriage; it must be followed by a solemnization.*
"Sec. 5. SOLEMNIZATION OF MARRIAGE.

A marriage may be solemnized by any recognized clergyman or other official duly authorized to perform this ceremony by the laws of the State of Nevada, only after issuance of a state license; or by any recognized clergyman or any judge of the Pyramid Lake Tribal Court, only after issuance of a license."

at Nixon before moving to Smith Valley, because Paul was still married to Mabel.

Next, respondents contend that because Paul and Allie did not enter into a marriage performed in accordance with tribal customs within a closed Indian colony as permitted by NRS 122.160[4] they never became husband and wife although they did live together outside the reservation for a protracted period after all disabilities to the marriage were removed.

In Nevada, throughout the United States, and in those parts of the world having their roots in the English Common Law, there is a strong public policy favoring marriage. That public policy is clearly stated in 35 Am.Jur., Marriage, Sec. 3, p. 181:

> "PUBLIC POLICY AS TO MARRIAGE—In view of the importance of marriage as a social institution, and the benefits accruing therefrom, it is favored by public policy and the law. It follows that a marriage will, if possible, be upheld as valid and that its validity will be presumed unless disproved. A statute will not be construed to make a marriage void unless the legislative intent to such effect is clear and unequivocal.
>
> "A marriage that the law sanctions cannot be against public policy in a legal sense."

Our law even clothes the relationship between a man and a woman deporting themselves as husband and wife with a rebuttable presumption they have entered into a lawful contract of marriage. NRS 52.070(24). As early as 1896, this court held that a marriage by mutual consent *per verba de praesenti* was valid in the face of a statute which required certain formal

---

[4]"122.160 **Marriages between Indians performed by tribal custom on reservation or in colony: Validity; certificate of declaration.**

1. Marriages between Indians performed in accordance with tribal customs within closed Indian reservations and Indian colonies shall be of the same validity as marriages performed in any other manner provided for by the laws of this state, provided there is filed in the county in which the marriage takes place, within 30 days after the performance of the tribal marriage, a certificate declaring the marriage to have been performed.

2. The certificate of declaration required to be filed by subsection 1 shall give the names of the persons married, their ages, tribe, and place and date of marriage. The certificate shall be signed by some official of the tribe, reservation or colony.

3. The certificate shall be filed with the recorder of the county in which the marriage was performed and recorded by him without charge."

preliminaries, even though not complied with, when the statute did not contain an express clause of nullity. State v. Zichfeld, 23 Nev. 304, 46 P. 802 (1896); 61 A.L.R.2d 847, 849. See also Clark v. Clark, 80 Nev. 52, 389 P.2d 69 (1964).

The presumption in favor of the validity of marriages has been extended to marriage by Indian custom. Chancey v. Whinnery, 147 P. 1036 (Okla. 1915). It is true that Indians living off an Indian Reservation are subject to the laws of the state in which they reside to the same extent that a non-Indian citizen or alien would be subject to those laws. In re Wo-Gin-Up's Estate, 192 P. 267 (Utah 1920); In re Paquet's Estate, 200 P. 911 (Ore. 1921). Thus, absent special statutory authorization, neither Paul and Allie, nor any other non-Indian or alien citizen of Nevada could have achieved a valid marriage by simply living together in Smith Valley, off an Indian Reservation, for 6 or 60 years. NRS 122.010. Still, the legislature has provided that Indians living off a reservation are permitted to consummate a marriage in accordance with tribal customs which shall have the same validity as marriages performed in any other manner in Nevada. NRS 122.170.

Respondents argue, however, that because they did not obtain a certificate from one of the officials named in the statute nor file such certificate in the office of the recorder of the county where the marriage took place, there is and can be no marriage. But that contention has already been answered by this court in State v. Zichfeld, supra. There, as here, unless the statute declares such a marriage relationship a nullity, which it does not, we hold Sections 2, 3, 4, and 5 directory only. Nor does the fact that Paul may have been still married to Mabel[5] when he commenced living with Allie in Smith Valley in 1951 prevent a valid marriage. All parties concede he was lawfully divorced from Mabel in 1954, and any disability he suffered as to a future marriage was removed. Ormachea v. Ormachea, 67 Nev. 273, 217 P.2d 355 (1950).

We thus hold Paul and Allie consummated a valid marriage in accordance with tribal customs while living in Smith Valley from 1954 to Paul's death in 1960. At his death, Allie became

---

[5]The briefs discuss at length the issue of Indian custom divorce. But we see no need for a discussion of that issue in view of our decision above.

his widow and is entitled to that part of his estate permitted by law.

The judgment of the lower court is reversed and the matter remanded for proceedings consistent with this decision.

ZENOFF, BATJER, MOWBRAY, and THOMPSON, JJ., concur.