WALTER VOORHEES, KENNETH VOORHEES, BERT
EDWARD SUMMERFIELD, EVELYN F. BALL,
LORENA F. BURNS, AND JOHN E. FRANK, JR.,
APPELLANTS, v. MARIANNE SPENCER, ADMINISTRA-
TRIX OF THE ESTATE OF RAYLEN STANLEY VOORHEES,
DECEASED; AND HAZEL JEWEL McMASTERS,
RESPONDENTS.

No. 6722

January 8, 1973                    504 P.2d 1321

*Lohse and Lohse,* of Reno, for Appellants.

*Leonard P. Root,* of Las Vegas, for Respondent Spencer.

*Joseph P. Reynolds* and *Denne J. Mancuso,* of Reno, for Respondent McMasters.

## OPINION

By the Court, MOWBRAY, J.:

This is an appeal from a decree of final distribution in a proceeding involving the estate of Raylen Stanley Voorhees, who died intestate. The estate was administered by Marianne Spencer, the nominee of Hazel Jewel McMasters.

The appellants claim that Raylen Stanley Voorhees died a single man and that as his heirs they are entitled to distribution of his estate.

The trial judge found that Voorhees was married to Respondent Hazel Jewel McMasters at the time of his death. Upon such finding, the trial court ordered distribution of certain community property to Respondent McMasters and apportioned certain separate property among the appellants and Respondent McMasters.

1. *The Facts.*

Raylen Stanley Voorhees and Hazel Jewel Smith were married on May 29, 1942, in Sparks, Washoe County, Nevada. They were married by a Baptist minister after first obtaining a marriage license from the Clerk of Mineral County at Hawthorne, Nevada. Raylen was a Paiute Indian from the Walker River Indian Reservation at Schurz, Nevada. After the marriage, the couple took up residence at Hawthorne and purchased a home there. Raylen was employed at the United States Naval Ammunition Depot near Hawthorne, and Hazel worked in Hawthorne.

In the spring of 1946, Raylen and Hazel quarreled and separated. Raylen later disposed of the home and other property and moved to the family ranch on the Walker River Reservation. He continued to work at the Naval Ammunition Depot until 1960 or 1961, when he quit his job and devoted his efforts to farming and ranching on lands held in trust by the United States. He never married again. He died intestate on October 24, 1968, while a resident of the Walker River Indian Reservation.

When the parties separated in 1946, Hazel returned to the Pyramid Lake Indian Reservation at Nixon. For the next 8 or 9 years she lived in California, in Oregon, and at Nixon, Nevada, forming temporary alliances with male companions during that period. In 1964 or 1965, she moved to the Walker River Indian Reservation at Schurz and moved in with a man named Ellison McMasters, Jr. She adopted his surname, and they held themselves out as husband and wife, although they did not go through a marriage ceremony. Hazel was living at Schurz with McMasters at the time of Raylen's death.

Raylen's interest in property held in trust by the United States, or in which the United States had an interest, was administered by the Department of the Interior. A car, some money, and other personal property located on the Reservation were administered by the Tribal Court. This appeal involves the sum of $1,954.66 which Raylen had in a bank account in Fallon, Nevada.

2. *The Issues.*

The three issues involved in this appeal may be summarized as follows:

A.   Did the district court have jurisdiction to administer these estate assets and order distribution, in view of the provisions of NRS 41.430?[1]

B.   Had Raylen and Hazel obtained a valid Indian custom divorce?

---

[1]NRS 41.430:

"1.   Pursuant to the provisions of section 7, chapter 505, Public Law 280 of the 83d Congress, approved August 15, 1953, and being 67 Stat. 588, the State of Nevada does hereby assume jurisdiction over public offenses committed by or against Indians in the areas of Indian country in Nevada, as well as jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country in Nevada, subject only to the conditions of subsection 2 of this section.

"2.   This section shall become effective 90 days after July 1, 1955, and shall apply to all the counties in this state except that, prior to the effective date, the board of county commissioners of any county may

C. Is Hazel estopped from asserting that she was legally married to Raylen at the time of his death?

A. The question of whether NRS 41.430 prevented the district court from entertaining the probate proceeding was not raised in the court below. The parties concede that the Walker River Reservation was excluded from the provisions of NRS 41.430 by a proclamation authorized by NRS 41.430, subsection 2, *supra*.[2] As a general rule, matters affecting the very jurisdiction of the trial court to act may be raised for the first time on appeal. Pershing Quicksilver Co. v. Thiers, 62 Nev. 382, 152 P.2d 432 (1944); Provenzano v. Long, 64 Nev. 412, 183 P.2d 639 (1947).

If this probate proceeding comes within the classification of "civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country in Nevada" (NRS 41.430, subsection 1, *supra*), then the State district court was without jurisdiction. Davis v. Warden, 88 Nev. 443, 498 P.2d 1346 (1972).

Congress has plenary authority to regulate Indian affairs, pursuant to article 1, section 8, clause 3, of the United States Constitution. This would include determination of heirship, succession to property, and the subjecting of Indians' property to claims of creditors.

Our attention has not been directed to any Act of Congress which prohibits a State court from administering property owned by an Indian which is not located on a reservation and

---

petition the governor to exclude and except the area of Indian country in that county from the operation of this section and the governor, by proclamation issued before the effective date of this section, may exclude and except such Indian country.

"3. In any case where the governor does exclude and except any area of Indian country, as provided in subsection 2 of this section, he may, by subsequent proclamation at the request of the board of county commissioners of any county which has been excluded and excepted, withdraw and remove the exclusion and exception and thereafter the Indian country in that county shall become subject to the provisions of this section."

[2]Extension of State jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country now appears to require the consent of both the State and the Tribe occupying the particular Indian country. 25 U.S.C.A. § 1322, 82 Stat. 79 (1968).

is otherwise within the jurisdiction of the State court. Absent Congressional prohibition, if the event or matter in controversy which calls for judicial action arises outside Indian country, Indians are subject to the laws of the jurisdiction involved. In re Wolf, 27 F. 606 (W.D. Ark. 1886); Ex parte Moore, 133 N.W. 817 (S.D. 1911).[3] Indians have access to the State courts, and the State may regulate their activities outside Indian country, even though they are members of a Tribe and reside on a reservation. United States v. Candelaria, 271 U.S. 432 (1926); Trujillo v. Prince, 78 P.2d 145 (N.M. 1938); Harrison v. Laveen, 196 P.2d 456 (Ariz. 1948); In re Cantrell, 495 P.2d 179 (Mont. 1972).[4]

It is evident in our society that the activities of our Indian citizens may involve transactions and incidents outside the reservation as well as those confined to Indian country. In many cases, the transactions may involve incidents which occur partly on and partly off the reservation. A helpful guide in resolving questions of jurisdiction is found in the application of standard conflict-of-law principles, limited by the overriding authority of Congress to regulate Indian affairs.

It is clear that the State wherein personal property is located has full power to administer such property. In re Glassford's Estate, 249 P.2d 908 (Cal.App. 1952). The State has a legitimate interest in requiring probate of property within its borders, to protect creditors. The property administered by the trial court in the instant case was located off the reservation. The State has authority to require that it be administered for the protection of both creditors and claimants to the estate.

---

[3] In such cases, a persuasive argument can be made that a State could not deny access to its courts solely upon the basis of race or Indian statutes. Any justification for withholding access to its courts in such a case must be based upon jurisdictional grounds or an Act of Congress exercising its power over Indian affairs.

[4] United States v. Candelaria, *supra,* held that a suit brought by the Pueblo Tribe in a State court to quiet title was binding upon the Tribe and the United States. In Trujillo v. Prince, *supra,* it was held that the New Mexico court had jurisdiction to appoint an administrator for a deceased reservation Indian to prosecute a wrongful death action authorized under the laws of that State. Harrison v. Laveen, *supra,* permitted tribal Indians to bring action in State courts to enforce voting rights. In re Cantrell, *supra,* held that a State court could determine that a child found off the reservation was a dependent and neglected child and remove her from the custody of her mother, who resided on the reservation.

Application of the usual conflict-of-law rule prevailing in such a situation would require that the personal property be distributed in accordance with the law of the decedent's domicile. 23 Am.Jur.2d *Descent and Distribution* § 20 (1965).[5]

The State's action here did not infringe on the right of reservation Indians to make their own laws and be ruled by them, and the trial court was not precluded by NRS 41.430, *supra,* from assuming probate jurisdiction of this property which was located off the reservation.

B.   The second issue is whether Raylen and Hazel had been divorced by Indian custom at the time of his death. The Walker River Tribe permitted Indian custom divorce if there were found to exist (a) a permanent separation and (b) an intent of at least one of the parties that the marriage be terminated. When Raylen and Hazel were married, they did not establish any domicile on the Walker River Reservation, and Hazel was a member of another Tribe.[6] At the time of the separation in Hawthorne, Nevada, their marital status was not subject to the customs of the Walker River Tribe, and no Indian custom divorce was possible. Wells v. Thompson, 48 Am.Dec. 76 (Ala. 1848); La Framboise v. Day, 161 N.W. 529 (Minn. 1917); Moore v. Wa-me-go, 83 P. 400 (Kan. 1905); In re Wo-gin-up's Estate, 192 P. 267 (Utah 1920).

While they were living off the reservation, Raylen and Hazel were subject to the laws of the State in which they resided, to the same extent that a non-Indian citizen or alien would be subject to those laws. Ponina v. Leland, *supra.* No contention is made that Nevada authorizes or permits Indian custom divorces in those areas subject to its laws.

Both parties ultimately came to live within the jurisdiction of the Walker River Reservation. Raylen returned there sometime after the separation, and Hazel found her way there some 8 or 9 years later. Nevertheless, the record does not establish

---

[5]The parties did not offer any proof in the trial court of any tribal custom or rule affecting succession to an intestate estate or involving the interests of husband and wife. No assignment of error was made respecting the trial court's choice of law or the distributive shares, if, in fact, Raylen and Hazel were married.

[6]The Pyramid Lake Tribe, of which Hazel was a member, abolished Indian custom divorce in 1941. Ponina v. Leland, 85 Nev. 263, 454 P.2d 16 (1969).

any later agreement to live separate and apart, or any later act of separation, when either or both were living on the reservation, other than the separation in Hawthorne in 1946. Even on the issue of intent the record does not support any inference that Raylen intended to terminate and dissolve the marriage by any act or agreement of separation. Raylen did not consent to the separation. He did not separate from Hazel. There is nothing in the record to show that he intended to terminate the marriage. Rather, the evidence was quite to the contrary and to the effect that Raylen on several occasions refused to allow Hazel to seek a divorce and that he put her off when she requested him to do so. There was no change in Raylen's attitude, conduct, or acts after Hazel began living on the reservation with McMasters. The evidence regarding Hazel's intent after she took up residence on the Walker River Reservation was conflicting. The record discloses that Hazel adopted a double standard. When living with McMasters, she accepted the liberal customs of the Tribe, which would accord her social acceptance as McMasters's wife. Hazel believed that even under Indian custom she would have to go through some kind of an Indian or tribal ceremony or documentation of her marriage to McMasters. This was not done, as Hazel believed her marriage to Raylen could be dissolved only in the civil courts. After Hazel left Raylen, she lived with other men off the reservation, and these relationships were not regarded by her as marriages. One of the essential elements of a valid Indian custom divorce is that at least one of the parties intends to terminate the marriage by separation. This presupposes knowledge of the availability of an Indian custom divorce and an intent to effect such a divorce by complying with the requisite elements thereof. The trial judge found that Hazel did not have such an intent when she left Raylen in 1946, nor at any time thereafter, because she believed a civil divorce was necessary.[7] While different inferences could be drawn from the record, it was the function of the trial judge to resolve any conflicts

[7]The trial judge in his written opinion held in part:

". . . I cannot find that any new or different intent was formed by her [Hazel] after 1964 which would lead to a valid divorce, unless her adulterous alliance with McMasters would have that effect. I do not believe it does. Any court would be reluctant to hold, under any system of law, that an adulterous relationship would, per se, have the effect of dissolving a valid marriage. If such be the rule, it would elevate simple fornication, if carried on with the same man on a more or less continuous basis, to the status of a recognized social phenomena, [sic] which on one hand would terminate a valid marriage and on the other hand would form a new matrimonial contract. I do not believe that Indian custom divorces rest upon such a tenuous and unsavory basis. To

therein. We will not interfere as long as there was substantial evidence received to support his finding. Briggs v. Zamalloa, 83 Nev. 400, 432 P.2d 672 (1967). Thus, even though it is possible that a civil marriage may be dissolved by an Indian custom divorce in proper circumstances [Begay v. Miller, 222 P.2d 624 (Ariz. 1950)], we will not in the instant case disturb the conclusion reached by the trial court that the marriage of Raylen and Hazel was not terminated by divorce. It follows that she was his legal wife at the time of his death.

C. Appellants' third contention is that Hazel is estopped to deny that she and Raylen were divorced by Indian custom. The claimed estoppel is predicated on her alleged meretricious relationship with McMasters. An essential to the successful invoking of the doctrine of estoppel is that one party has, by the conduct of the other party, been induced to change his position to his detriment. State ex rel. Thatcher v. Justice Court, 46 Nev. 133, 207 P. 1105 (1922). No showing was made that Raylen changed his position in any way or that he was induced to do so as a result of Hazel's acts or conduct.

Appellants' real concern appears to be that Hazel is unfit to inherit from Raylen. The right to inherit is a matter committed to the Legislature. Wilson v. Randolph, 50 Nev. 371, 261 P. 654 (1927), aff'd on rehearing, 50 Nev. 440, 264 P. 697 (1928); In re Green's Estate, 196 N.W. 993 (Iowa 1924).

For these reasons, we conclude that Hazel was at the time of Raylen's death his legal wife and as such entitled to share in his estate. The decree of final distribution of the lower court in the estate proceedings is affirmed.

THOMPSON, C. J., and GUNDERSON, BATJER, and ZENOFF, JJ., concur.

accord these Indian custom divorces the dignity to which they are entitled, it seems to me that the necessary intent to terminate the marriage, which must accompany or follow the separation, must be shown by clear and satisfactory evidence. . . .

"It is appropriate to note that the character or conduct of Hazel Jewell [sic] Voorhees is not determinative of her rights to inherit. The law seeks everlasting principles to guide citizens in the conduct of their affairs. An attempt is made to apply these principles with an even hand. The principle applied here may, under other facts and circumstances, result in tangible economic, social and moral benefits for others who may find themselves in the same position as Raylen Voorhees."